THE M. H. PULASKI Co. *et al. v.* UNITED STATES (No. 1346). R. B. HENRY Co. *et al. v.* UNITED STATES (No. 1353). J. ELLIOTT & Co. *et al. v.* UNITED STATES (No. 1355). ROBERT MULLER & Co. *v.* UNITED STATES (No. 1364). WOOD & SELICK *et al v.* UNITED STATES (No. 1370). UNITED STATES *v.* J. WILE, SONS & Co. (No. 1391). UNITED STATES *v.* G. W. FABER (INC.) (No. 1392). UNITED STATES *v.* LOUIS MEYERS & SON (No. 1393). UNITED STATES *v.* WILLIAM OPENHYM & SONS *et al.* (No. 1394). UNITED STATES *v.* PARK & TILFORD (No. 1395). UNITED STATES *v.* SELGAS & Co. (No. 1396). E. LA MONTAGNE'S SONS *v.* UNITED STATES (No. 1399). CULLMAN BROS. *et al. v.* UNITED STATES (No. 1410). A. LORSCH & Co. *et al. v.* UNITED STATES (No. 1440).[1]

### STATEMENT.

These 14 cases, commonly known as the "Five Per Cent Cases," involve the construction of certain paragraphs in the tariff act of 1913 that are a part of section 4 and are in text as follows:

"B. That nothing in this act contained shall be so construed as to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on the eleventh day of December, nineteen hundred and two, or the provisions of the act of Congress heretofore passed for the execution of the same, except as to the proviso of article eight of said treaty, which proviso is hereby abrogated and repealed.

"J. Subsection 7. That a discount of 5 per centum on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States: *Provided*, That nothing in this subsection shall be so construed as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation.

"Q. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose for which no permit of delivery

----

[1] Reported in T. D. 35508 (28 Treas. Dec., 1024).

to the importer or his agent has been issued shall be subjected to the duties imposed by this act and to no other duty, upon the entry or withdrawal thereof: * * *."

Section 3 of the act in a subparagraph provides:

" S. Any merchandise deposited in any public or private bonded warehouse may be withdrawn for consumption within three years from the date of original importation on payment of the duties and charges to which it may be subject by law at the time of such withdrawal." * * *

Article I of the Cuban treaty provides reciprocally that all merchandise the product of the soil or industry of the respective parties which at the time of its negotiation was being imported into the other free of duty should continue to be so admitted into each country.

Article II provides that during the term of the treaty all merchandise not included in Article I "and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of 20 per cent of the rates of duty thereon, as provided by the tariff act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted."

Article VIII provides that "the rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of this convention preferential in respect to all like imports from other countries, and, in return for said preferential rates of duty granted to the Republic of Cuba by the United States, it is agreed that the concession herein granted on the part of the said Republic of Cuba to the products of the United States shall likewise be, and shall continue, during the term of this convention, preferential in respect to all like importers from other countries."

Certain other treaties with some nine nations, the continuing existence of which was conceded at the hearing, were outstanding and in force at the date of the enactment of the tariff law, each containing what is referred to as the "reciprocal commercial provision." A clause in the treaty between the United States and Italy is taken as an example of the treaties in question, and it is as follows:

"The high contracting parties agree that whatever kind of produce, manufactures, or merchandise of any foreign country can be from time to time lawfully imported into the United States, in their own vessels, may be also imported in Italian vessels; that no other or higher duties upon the tonnage of the vessel or her cargo shall be levied and collected, whether the importation be made in vessels of the one country or of the other; and, in like manner, that whatsoever kind of produce, manufactures, or merchandise of any foreign country can be from time to time lawfully imported into Italy in its own vessels may be also imported in vessels of the United States, and that no higher or other duties upon the tonnage of the vessel or her cargo shall be levied and collected, whether the importation be made in vessels of the one country or of the other; and they further agree that whatever may be lawfully exported and reexported from the one country, in its own vessels, to any foreign country, may in the like manner be exported or reexported in the vessels of the other country, and the same bounties, duties, and drawbacks shall be allowed and collected, whether such exportation or reexportation be made in vessels of the United States or of Italy."

The questions for decision raised here are (a) whether or not J, subsection 7, became operative when said tariff act of 1913 took effect; (b) whether merchandise imported in vessels of United States registry was immediately entitled to the 5 per cent discount; (c) whether merchandise imported in the registered vessels of said treaty nations was immediately entitled to the like discount; (d) whether merchandise entered in bond for warehousing before the act took effect, subsequently withdrawn and entered for consumption, was entitled to such discount; (e) whether merchandise imported from Cuba was entitled to the 20 per cent reduction provided in the Cuban treaty, and to the 5 per cent discount provided in said J, subsection 7.

1. STATUTORY CONSTRUCTION.

It will be presumed that the Congress will not do a vain thing; that it intends its acts and every part of them to be held valid and as capable of being given effect.

2. IBID.

All statutes are to be construed so as to sustain rather than to ignore or defeat their purpose; to give them a field of operation, if the language will permit, rather than to treat them as meaningless.

3. IBID—PROVISOS.

The exception of a particular thing from the operation of the general words of a statute shows that in the opinion of the lawmaker the thing excepted would be

within the general words had not the exception been made. But a proviso is not to be so construed as to make it plainly repugnant to the body of the section it limits.

4. TREATIES, ABROGATION OF.

The Congress may abrogate a treaty made by the United States, and this may be accomplished either by legislation to that end or by legislation that by necessary implication results in abrogation; but here—

5. J. SUBSECTION 7, TARIFF ACT OF 1913.

It is clear the Congress intended to give present effect to the law, and by the named proviso, as was declared, intended that the paragraph in chief should not be held to abrogate the treaties in question or impair any rights thereunder. The treaties must be taken to forbid discrimination against merchandise imported in the vessels of a treaty nation. Whether the discriminations as forbidden relate primarily to the means or instrumentalities of transit and not to the products, *reserved*.

6. *Held*, in these cases—

(*a*) That the merchandise involved, imported in the registered vessels of the United States, is entitled to the 5 per cent discount, as held by the board, whose judgment relating thereto is hereby affirmed.

(*b*) That as to the merchandise imported in the registered vessels of the said treaty nations, both that which was imported and entered for consumption subsequent to to the taking effect of the tariff act of 1913, as well as that which was brought to our ports prior thereto and entered in bond for warehousing, subsequently withdrawn for consumption and duties paid, the 5 per cent discount must be allowed, and with respect to such merchandise the judgment of the Board of General Appraisers is reversed.

(*c*) That the merchandise imported in vessels of our registry before the tariff act of 1913 took effect which was entered in bond for warehousing, subsequently withdrawn and entered for consumption and duties paid, is entitled to the 5 per cent discount thereon, and the judgment of the board with respect thereto is reversed.

(*d*) That the merchandise from Cuba is entitled to the reduction of 20 per cent ad valorem provided by the Cuban treaty and the further discount of 5 per cent ad valorem from the amount so ascertained. As to such importations, the judgment of the Board of General Appraisers is affirmed.

## United States Court of Customs Appeals, May 26, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7540 (T. D. 34246), Abstract 35154 (T. D. 34307), Abstract 35619 (T. D. 34459), Abstract 36281 (T. D. 34704).

[Affirmed in part; reversed in part.]

*Bert Hanson*, Assistant Attorney General (*William A. Robertson*, special attorney, of counsel), for the United States.

*Curie, Smith & Maxwell* (*Thomas M. Lane* of counsel) for Pulaski Co. (1346) and Openhym & Sons (1394); *Comstock & Washburn* (*Albert H. Washburn* of counsel) for Henry Co. (1353), Elliott & Co. (1355), and Wile, Sons & Co. (1391); *Allan R. Brown* for Faber (Inc.) (1392); *Walden & Webster* for Muller & Co. (1364); *Brooks & Brooks* (*F. W. Brooks, jr.*, of counsel) for Wood & Selick (1370) and Meyers & Son (1393); *B. A. Levett* for Park & Tilford (1395) and La Montagne's Sons (1399); *McLaughlin, Russell, Coe & Sprague* (*Edward P. Sharretts* of counsel) for Selgas & Co. (1396) and Lorsch & Co. (1440); *Gerry & Wakefield* (*Edwin R. Wakefield* of counsel) for Cullman Bros. (1410).

*William L. Wemple* (*Frank L. Lawrence* on the brief) as *amicus curiæ*.

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

Barber, Judge, delivered the opinion of the court:

These cases, some fourteen in number, are generally known as the "Five Per Cent Cases." Some of them involve one only and others more than one of the various issues. Numerous counsel for the litigating parties and an *amicus curiæ* have filed briefs and made full oral arguments, all of which have been carefully considered by the court.

The importance of these cases has not been overlooked, and we are indebted to the eminent counsel who have so ably and fully presented their respective views and the authorities supporting the same.

While the names of the importers in each case are given in the caption of the opinion, it is not thought necessary to refer specifically thereto hereinafter, as our decision upon the issues involved will readily suggest the disposition to be made of each individual case.

The tariff act of 1913, approved by the President October 3, provided in the enacting clause thereof as follows:

That on and after the day following the passage of this act, except as otherwise specially provided for in this act, there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands and the islands of Guam and Tutuila) the rates of duty which are by the schedules and paragraphs of the dutiable list of this section prescribed, namely:

Thereinafter numerous paragraphs fixing rates of duty follow.

Near the end of the act are found the following provisions, under section 4:

B. That nothing in this act contained shall be so construed as to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on the eleventh day of December, nineteen hundred and two, or the provisions of the act of Congress heretofore passed for the execution of the same, except as to the proviso of article eight of said treaty, which proviso is hereby abrogated and repealed.

J. Subsection 7. That a discount of 5 per centum on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States: *Provided*, That nothing in this subsection shall be so construed as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation.

Q. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose for which no permit of delivery to the importer or his agent has been issued shall be subjected to the duties imposed by this act and to no other duty, upon the entry or withdrawal thereof. * * *

Section 3 of the act in a subparagraph provides as follows:

S. Any merchandise deposited in any public or private bonded warehouse may be withdrawn for consumption within three years from the date of original importation on payment of the duties and charges to which it may be subject by law at the time of such withdrawal. * * *

On divers dates after said tariff act took effect certain merchandise was imported into the United States in various vessels, all of which, at the time the importations were made, were registered either under the laws of the United States or under the laws of some foreign nation between which and the United States there were, at the time the act went into effect and at the time of such importations, certain treaties commonly entitled treaties of "commerce and naviga-tion" and sometimes of "friendship, commerce, and navigation."

The important question here is, Was the merchandise so imported entitled to the benefit of the 5 per cent discount referred to in said J, subsection 7?

It is apparent that this question may be divided into two parts.

The first part will relate wholly to merchandise imported in vessels admitted to registration under the laws of the United States.

The second will relate wholly to merchandise imported in vessels registered under the laws of any one of the foreign-treaty nations, above referred to, and if these treaties are all of the same legal import and like relevant conditions attended each importation it follows that a determination of the dutiable status of the merchandise imported in the vessels of one of such nations will determine the like status of that imported in the vessels of any other thereof.

A related and dependent question also arises from the fact that some of the merchandise was brought into the United States shortly before the act of 1913 took effect and entered without payment of duty and under bond for warehousing pursuant to law. This merchandise was, after the act took effect, withdrawn from bonded warehouse, entered for consumption, the duty thereon paid, and delivery permit therefor issued. The question is whether or not, in view of the fact that this merchandise was so imported before the act took effect, the 5 per cent discount can be allowed thereon. This merchandise is also of two classes—one, that imported in vessels of United States registry, and the other, that imported in vessels of said treaty nations.

There are in addition special questions as to certain merchandise imported, after the act of 1913 took effect, from Cuba in ships of United States registry; also questions raised by the Board of General Appraisers as to the character and constitutionality of certain treaty stipulations.

All these will be later stated and considered.

The Board of General Appraisers held in all cases that the merchandise imported in vessels of United States registry *after* the act

of 1913 took effect was entitled to the 5 per cent discount mentioned in J, subsection 7. As to such decisions, the Government is the appellant here.

In all cases where the merchandise was imported in vessels of foreign registry, the board held that it was not entitled to the benefit of that discount. As to such decisions, the importers are the appellants.

In all cases where the merchandise was under bond for warehousing on the date when the act of 1913 took effect, the board held that it was not entitled to the 5 per cent discount. As to such decisions, the importers are the appellants.

The nations between which and the United States the treaties already referred to were outstanding at the time the tariff act of 1913 took effect, and the dates when the respective treaty ratifications were exchanged, are as follows:

Great Britain, December 22, 1815, indefinitely extended August 2, 1827.

Norway and Sweden, January 18, 1828.

German Empire: Hanseatic Republics, June 2, 1828; Prussia, March 14, 1829; Hanover, November 14, 1840; Mecklenburg-Schwerin, May 20, 1828.

Austria-Hungary, February 10, 1831.

Netherlands, February 25, 1853.

Italy, November 18, 1871.

Belgium, June 11, 1875.

Japan, March 21, 1895.

Spain, April 14, 1903.

(See Malloy's Treaties, Conventions, etc., between the United States and other powers, published under the authority of the Senate in 1910, vols. 1 and 2.)

Some of these treaties relate to divers subjects, but all contain provisions touching commercial relations between the high contracting parties. Each contains reciprocal provisions, some limited with reference to the place of the origin of the merchandise and others not so, providing in substance that merchandise imported in the vessels of the one party into the ports of the other shall not be charged a higher or other rate of duty than such other party charges on the like merchandise when imported therein in its own vessels.

For convenience, these provisions will be herein referred to as reciprocal commercial provisions. As substantially a typical illustration of such a provision, Article V of the Italian treaty is here quoted:

The high contracting parties agree that whatever kind of produce, manufactures, or merchandise of any foreign country can be from time to time lawfully imported into the United States, in their own vessels, may be also imported in

Italian vessels; that no other or higher duties upon the tonnage of the vessel or her cargo shall be levied and collected, whether the importation be made in vessels of the one country or of the other; and, in like manner, that whatsoever kind of produce, manufactures, or merchandise of any foreign country can be from time to time lawfully imported into Italy in its own vessels may be also imported in vessels of the United States, and that no higher or other duties upon the tonnage of the vessel or her cargo shall be levied and collected, whether the importation be made in vessels of the one country or of the other; and they further agree that whatever may be lawfully exported and re-exported from the one country, in its own vessels, to any foreign country, may in the like manner be exported or reexported in the vessels of the other country, and the same bounties, duties, and drawbacks shall be allowed and collected, whether such exportation or reexportation be made in vessels of the United States or of Italy.

In the treaty with Great Britain this reciprocal commercial provision is limited to the importation into the United States of articles which are "the growth, produce, or manufacture of his Britannick Majesty's territories in Europe," and reciprocally to the importation " into the territories of his Britannick Majesty in Europe of any articles the growth, produce, or manufacture of the United States."

These reciprocal commercial provisions are couched in differing phraseology in the various treaties, but an examination thereof satisfies us that in legal effect they are the same so far as regards the merchandise to which they relate. We understand all parties here agree to this conclusion.

Respecting the treaty with Norway, which is involved in some of these cases, it may be noted that the treaty was in fact made with Norway and Sweden when under the same government. We treat the matter as if this treaty had been made between Norway and the United States. Such is the claim of both the Government and the importers. Indeed, we understand the treaty has been so regarded by the United States, and that it is so regarded by Norway may be concluded, as the Government points out in its brief, from the communication addressed to our Secretary of State from the Norwegian legation under date of November 7, 1905. See Malloy's Treaties, Conventions, etc. (vol. 2, p. 1300).

It may with propriety also be observed here that as to the treaties referred to under the title of " German Empire " it is agreed that although made between the United States and what are now different parts of the German Nation they are all treated as and conceded to be in force. That they have likewise in other cases been so regarded is indicated by the decisions in Terlinden v. Ames (184 U. S., 270) and Disconto Gesellschaft v. Umbreit (208 U. S., 570).

What is generally known as the " favored-nation clause " is also to be found in some of these treaties. More especial reference thereto will be made hereafter.

At the outset the Government unqualifiedly concedes that the said reciprocal commercial provisions are effective and in force as the law of the land, and that by virtue thereof any discount that may be legally allowed to merchandise imported in vessels of United States registry must also be allowed to the like merchandise when imported in vessels of the foreign-treaty nations—that is, if it is allowed to merchandise imported in our vessels, it can not be denied to like merchandise imported in said foreign vessels without violating said reciprocal commercial provisions. It also concedes that it is within the jurisdiction of the judiciary to consider and construe said reciprocal provisions.

Thus far the Government and importers are in accord.

The Government, however, insists, because of the fact that if the discount is allowed to merchandise imported in our vessels and denied to that imported in such foreign vessels, said reciprocal commercial provisions will be violated; that J, subsection 7, when construed in the light of its legislative history, precludes the allowance at the present time of the discount to any merchandise.

Stated in the language of its brief, the Government's claim is:

In other words, so long as treaties between the United States and foreign nations, containing provisions that the vessels of such foreign nations shall be treated upon the same footing as vessels of the United States, are in effect, the right to the discount is postponed and can not accrue, because it is expressly provided that the allowing of the discount shall not "in any manner impair or affect the provisions" of any such treaty; and, therefore, it is a *condition precedent* to the giving of a discount that no such treaty provision shall be impaired or affected in any manner.

Upon oral argument the able Assistant Attorney General stated his claim in substance and effect to be that the subsection as a whole should be regarded as the declaration of a policy, which may or may not some time be adopted, but which is not by the subsection enacted into law now in force, although conditions may arise in the future, for instance if and when all the treaties in question shall have been denounced, when effect may be given thereto as affirmative law.

All the importers challenge the correctness of the Government's interpretation of the subsection, and claim that under applicable canons of construction it must be held that the subsection is operative *in præsenti.* Some go further and undertake to show by shipping statistics contained in certain public reports and documents that the amount of imported tonnage to which the 5 per cent discount can not be allowed is so great that there will result a substantial discrimination in favor of our merchant marine.

The Government meets this last claim of importers by undertaking to show from the same statistics that such discrimination will be so small as to be practically negligible, which fact, it argues, strongly

supports its contention that the operation of the subsection must be postponed.

It is obvious, if the Government's contentions are sound, that the 5 per cent discount can not be allowed in any of these cases, and we therefore proceed to consider them.

Preliminary thereto certain rules of statutory construction may profitably be adverted to.

It will be presumed that the lawmaking body will not do a vain thing, and that it intends that its acts and every part of them are valid and capable of being carried into effect. (Lewis's Sutherland Statutory Construction, sec. 497.)

All statutes are to be so construed as to sustain rather than ignore or defeat them; to give them operation, if the language will permit, instead of treating them as meaningless. (Lewis's Sutherland Statutory Construction, sec. 498) ; Bird v. United States (187 U. S., 118) ; Bernier v. Bernier (147 U. S., 242) ; Louisville Water Co. v. Clark (143 U. S., 1) ; Market Company v. Hoffman (101 U. S., 112) ; Platt v. Railroad Company (99 U. S., 48).

As to provisos, one rule is that "the exception of a particular thing from the operation of the general words of a statute shows that in the opinion of the lawmaker the thing excepted would be within the general words had not the exception been made." (Lewis' Sutherland Statutory Construction, sec. 351.) Another is that a proviso should not be construed so as to be plainly repugnant to the body of the section. Greely v. Thompson (10 How., 51 U. S., 225, 236) ; Savings Bank v. United States (19 Wall., 86 U. S., 227) : Sonneborn Sons v. United States (1 Ct. Cust. Appls., 443; T. D. 31504) ; Minis v. United States (15 Pet., 40 U. S., 421) ; Interstate Commerce Commission v. Baird (194 U. S., 25, 36).

There is also another well-settled rule, which is that if the language employed in a statute is free from ambiguity and doubt and plainly, clearly, and distinctly expresses the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. The statute itself furnishes the best means of its own exposition. (Lewis' Sutherland Statutory Construction, sec. 366, and cases cited.)

The force and application of these rules will be kept in mind in the discussion.

Considered in the light thereof it almost seems that J, subsection 7, requires no critical analysis to ascertain its meaning. It declares that " a discount of 5 per cent on all duties imposed by this act shall be allowed on such * * * merchandise as shall be imported in vessels admitted to registration under the laws of the United States." There is nothing in this language that is ambiguous as to the *time* when it shall take effect. The discount *shall be allowed*. The enact-

ing clause of the tariff law provides that "on and after the day following the passage of this act" the duties prescribed therein "shall be levied, collected, and paid." These provisions of the enacting clause and the subsection are equally explicit and, plainly, together they declare that the prescribed duties when ascertained shall, so far as relates to merchandise imported in vessels of our registry, be diminished by the discount of 5 per cent from what otherwise would be chargeable thereon. The right to the discount attaches at the same instant that the liability to the normal duty accrues. There is no language that suspends or defers it unless it may be found in the proviso. We do not find it there. It simply declares that nothing in the subsection shall be construed "to abrogate or in any manner impair or affect the provisions of any treaty."

The law is well settled that Congress may by statute abrogate a treaty previously made by the United States with another nation. United States v. Lee Yen Tai (185 U. S., 213, 220, and cases cited); Sanchez v. United States (216 U. S., 167); Rainey v. United States (232 U. S., 310); American Express Co. v. United States (4 Ct. Cust. Appls., 146; T. D. 33434).

And this may be accomplished either by legislation expressly directed to that end or that which by *necessary* implication so results.

The effect of the subsection, were it not for the proviso, therefore, would have been, as is agreed, to affect, impair, or abrogate the reciprocal commercial treaty provisions, and the effect of the proviso is to preserve and save the rights granted in such reciprocal provisions. So far as the *language* of the proviso is concerned, there is no indication that it was thereby intended to suspend or defer the operation and effect of the subsection as a whole. The time when the discount is to be allowed is provided in the first part of the subsection, and is the time when the liability to the duty accrues, but the quantity of merchandise to which it applies is enlarged by the proviso.

We think the discussion of this question might well conclude here, but the Government with great zeal and earnestness presses the claim that if the legislative history of the statute be considered a contrary conclusion will be compelled, and out of regard to this and to the importance of these cases we give the subject further examination. It is fruitless, however, to discuss at much length what would have been the effect of the section as enacted by the House. It is not denied that it would have contravened or repealed the treaties. Such a result is manifestly what the Congress undertook to prevent.

As first enacted in the House of Representatives and sent to the Senate as a part of the tariff bill the subsection was identical with that as first quoted in this opinion with the proviso omitted. The Ways and Means Committee of the House reported to that body that this subsection was "a discrimination in favor of American shipping similar to the provisions of some of the first tariff bills enacted by

Congress," and, in substance, further that under like legislation the merchant marine of the United States in the past had been largely developed and it was believed by again adopting the policy of discrimination that the upbuilding of a merchant fleet would again be promoted and the money kept at home which is now being paid to foreign vessels to carry our products to foreign markets. (See p. 52 of report of Ways and Means Committee to accompany H. R. 3321.) In ensuing debate the House had its attention specifically called to the claim that the subsection contravened the provisions of 20 or more commercial treaties, or, if not so, that it extended the 5 per cent discount to merchandise imported in the registered vessels of the treaty nations; and also to the fact that there were only a limited number of maritime nations with which we had no such treaty. (50 Cong. Rec., pt. 2, pp. 1345–1358.)

This provision became the subject of examination and discussion in the Senate. The Finance Committee in reporting the bill to that body stated it had stricken out this subsection, for which action it gave the following explanation:

The provision was in contravention of some 19 or 20 treaties of the United States, without having been preceded by the courtesy of a notice of revocation, and was very properly protested against by the high contracting parties with whom we had the treaties. In our opinion it would have led to no good result, as every other country could have retaliated, and all the countries at the end would have been just about where they started. Moreover, the country which could use that principle with most force and effect in injuring other countries would be the country with the largest merchant marine, and the country which could least effectively use it would be the country with the smallest merchant marine. We were therefore not only inviting an endless retaliation but a retaliation where our opponents would have had in nearly every case the better of it, and in many cases infinitely the better. (50 Cong. Rec., pt. 3, p. 2515.)

During the consideration of subsection 7, as it came from the House, a substitute therefor was offered in the Senate, providing in substance that dutiable merchandise imported in vessels not built or registered under the laws of the United States should pay a duty of 10 per cent ad valorem in addition to the duties otherwise imposed by the act, and if the goods were free, an ad valorem duty of 5 per cent thereon, with a proviso directing the President without unnecessary delay to cause to be abrogated all treaties contravening said substitute amendment, and that until so abrogated the proposed statute should not apply to merchandise imported in vessels affected by such treaties.

This amendment was rejected by the Senate. (50 Cong. Rec., pt. 5, pp. 4494, 4548.)

Thereupon another amendment was offered restricting the provisions of the subsection, as it came from the House, to " vessels built in the United States or admitted to registration prior to the passage

of this act under the laws of the United States," with a proviso "that the President is directed to cause to be abrogated without unnecessary delay and in the manner therein provided all treaties which contravene this provision, and until so abrogated this provision shall not apply to goods, wares, and merchandise imported in vessels affected by such treaties." This, too, was rejected.

Shortly thereafter the entire subsection as it came from the House was stricken from the bill by a "yea-and-nay" vote upon the question as to whether the Senate would concur with its previous action as in the Committee of the Whole striking out the subsection. (50 Cong. Rec., pt. 5, p. 4548.)

The bill as passed by the Senate and returned to the House contained neither the subsection nor any equivalent.

While the bill was before the Senate the President transmitted thereto, in response to its request made to the Secretary of State, certain documents. Among the same was a letter dated May 26, 1913, to the last-named official from the Secretary of the Treasury. Therein attention was called to J, subsection 7, concerning which the Secretary of the Treasury wrote:

It has been pointed out to me, directly and indirectly, that this provision may result in the violation of many of our treaties with foreign nations and is almost sure to result in international complications and diplomatic negotiations. Consequently, I earnestly suggest the advisability of submitting to the counselor for the State Department, or such other officer as you may deem proper, the question as to whether or not this provision is in violation of any existing treaty rights.

Apparently this suggestion was at once acted upon, and the letter of Hon. John Bassett Moore, counselor for the Department of State, answering this letter of the Secretary of the Treasury, was also transmitted by the President to the Senate. That letter we reproduce here:

DEPARTMENT OF STATE,
*Washington, May 28, 1913.*

The SECRETARY OF THE TREASURY.

SIR: Replying to your letter of the 26th instant, in which you request an expression of the opinion of the department as to whether subsection 7, paragraph J, of section 4 of the pending tariff bill (H. R. 3321) conflicts with the provisions of our treaties, I have the honor to say:

The clause in question reads as follows:

" J. Subsection 7. That a discount of 5 per cent on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States."

We have treaties with numerous countries, including the Argentine Republic, Austria-Hungary, Belgium, Colombia, Costa Rica, Denmark, Great Britain, the Hanseatic Republics, Italy, Japan, the Netherlands, Norway, Prussia, Spain, and Sweden, which provide, in one form or another, that neither contracting party shall charge a lower rate of duty on merchandise imported in its own vessels than it charges on merchandise imported in vessels of the other contracting party.

The earliest of these treaties now in force is that with Great Britain, concluded July 3, 1815, during the administration of Madison. It contains (art. 2) the following clause:

"The same duties shall be paid on the importation into the United States of any articles the growth, produce, or manufacture of His Britannic Majesty's territories in Europe, whether such importation shall be in vessels of the United States or in British vessels, and the same duties shall be paid on the importation into the ports of any of His Britannic Majesty's territories in Europe of any article the growth, produce, or manufacture of the United States, whether such importation shall be in British vessels or in vessels of the United States."

The convention of commerce and navigation with Denmark, concluded April 26, 1826, during the administration of John Quincy Adams, contains (art. 3) the following clause:

"They (the contracting parties) likewise agree that whatever kind of produce, manufacture, or merchandise of any foreign country can be from time to time lawfully imported into the United States, in vessels belonging wholly to the citizens thereof, may be also imported in vessels wholly belonging to the subjects of Denmark; and that no higher or other duties upon the tonnage of the vessel or her cargo shall be levied and collected, whether the importation be made in vessels of the one country or of the other."

Following this passage there is a reciprocal provision as to importations in American vessels into Denmark.

Substantially similar stipulations may be found in Article III of the treaty of commerce and navigation with Sweden and Norway, concluded July 4, 1827.

Article III of the treaty of commerce and navigation with Prussia, concluded May 1, 1828, contains the following stipulation: "All kinds of merchandise and articles of commerce, either the produce of the soil or of the industry of the Kingdom of Prussia, or of any other country, which may be lawfully imported into the ports of the United States in vessels of the said States, may also be so imported in Prussian vessels without paying other or higher duties or charges of whatever kind or denomination levied in the name or to the profit of the Government, the local authorities, or of any private establishments whatsoever, than if the same merchandise or produce had been imported in vessels of the United States of America."

The article contains a reciprocal provision as to importations into Prussia in American vessels.

Similar clauses exist in the treaty of commerce and navigation between the United States and Austria-Hungary, concluded August 27, 1829.

The convention of commerce and navigation between the United States and the Netherlands, concluded August 26, 1852, contains the following article:

"ARTICLE 1. Goods and merchandise, whatever their origin may be, imported into or exported from the ports of the United States from and to any other country in vessels of the Netherlands, shall pay no higher or other duties than shall be levied on the like goods and merchandise imported or exported in national vessels. Reciprocally goods and merchandise, whatever their origin may be, imported into or exported from the ports of the Netherlands from and to any other country in vessels of the United States shall pay no higher or other duties than shall be levied on the like goods and merchandise imported or exported in national vessels."

The treaty of commerce and navigation with the Argentine Republic, concluded July 27, 1853, briefly provides as follows:

"ART. 6. The same duties shall be paid and the same drawbacks and bounties allowed upon the importation and exportation of any article into or

from the territories of the United States or into or from the territories of the Argentine Confederation, whether such importation or exportation be made in vessels of the United States or in vessels of the Argentine Confederation."

It will be observed that article 6 above quoted refers to drawbacks and bounties. Similar stipulations are found in other treaties.

The various stipulations above quoted suffice to show the purport of the treaty provisions with which the proposed subsection is alleged to conflict. This allegation appears to be well founded if, as seems to be the case, it is intended by the subsection to allow the discount on duties only on merchandise imported in American registered vessels. Governments having treaty stipulations with the United States, such as those above quoted, probably would not object to the discount if it were extended, in conformity with those stipulations, to merchandise imported into the United States in their respective vessels; but they would not acquiesce in a discriminatory levy of lower duties on goods imported into the United States in American registered vessels because it was called a discount. It is the fact that a lower duty is charged, and not the term by which the reduction is described, with which the department is obliged to deal.

The department has received one communication from a Government with which we have at present no such treaty stipulations as those above quoted. This communication proceeds from the Government of France, whose ambassador at this Capital has made to the department with reference to the subsection in question the following statement:

"This is tantamount to what was formerly styled the 'flag surtax' that was given up because, as every nation availed itself of it, there was no advantage in maintaining a system that was bringing inconvenience to all and profit to none. If such clause were enacted, reciprocal measures would unfailingly be taken. The French administration would have no choice in the matter, since it would be bound to act upon article 6 of the law of May 19, 1866, which directs the levying of countervailing duties on the vessels of any Government which, to the detriment of our own marine, adopts a system of duties or taxes from which its own is exempt."

I have the honor to be, sir,
Your obedient servant,                    J. B. MOORE, *Counselor.*
                                          (For the Secretary of State.)

(50 Cong. Rec., pt. 5, p. 4237.)

In due course the bill was sent to a conference committee and action there had, which resulted in placing in the bill the subsection in the language found in the statute. In returning its report to the House this committee stated that subsection 7 was amended by the conference " to provide that nothing in this section should be so construed as to abrogate or affect the provisions of any treaty with any foreign country." The corresponding report to the Senate was that the original subsection had been restored and the proviso added. (50 Cong. Rec., pt. 6, pp. 5229, 5311.)

Before the bill was enacted into law a letter from the solicitor of the Department of State, Mr. Joseph W. Folk, to Senator Simmons, chairman of the Finance Committee, was incorporated into the Record, in which the writer expressed views as to the effect of J, subsection 7, that are in accord with those entertained by Counselor Moore. (50 Cong. Rec., p. 5345.)

It would seem from these letters that both the counselor and the solicitor understood that there was no reciprocal commercial provision in the outstanding French treaty, and that the latter also understood that the treaties with certain former independent German States, now constituting parts of the German Empire, were regarded by this country, as well as the Empire, as being still in effect.

The foregoing history of J, subsection 7, clearly demonstrates that the House in the first instance thereby undertook to discriminate in favor of our vessels, apparently without particular regard to the effect thereof upon treaties and treaty rights. The executive departments charged with the duty of looking after our relations with foreign countries and the collection of customs duties, whether under statutes or treaties, or both, became apprehensive that certain treaties would thereby be violated and international complications ensue. To prevent these obviously deplorable results the matter was brought to the attention of Congress in the manner already indicated. The Senate thereupon being satisfied that the proposed subsection would violate numerous treaties, among them those involved here, and that international complications would follow, insisted upon an amendment which would, while preserving the original design of the House, so far as consistent with treaty rights it could be preserved, nevertheless absolutely forbid such a construction or application thereof as would bring about a realization of the fears of the State and Treasury Departments, which amendment was adopted. It was never, so far as we can learn, in debate or otherwise, suggested that the subsection would not take effect coincidently with the rest of the act.

Summing up the matter it may well be concluded that the proviso to the subsection is the concurring answer of Congress to the objections so made to the subsection as proposed by the House and its declaration that no treaty should thereby be violated, all of which was accomplished in the manner suggested by Counselor Moore; that is, by extending the discount in conformity with the treaty stipulations to merchandise imported in the registered vessels of such nations. Thereby all international complications, otherwise sure to arise, were avoided, and also thereby scope was given for the operation of the plan of encouraging our merchant marine.

The Government really urges that the subsection should be construed as if the proviso thereto read as follows:

*Provided, however,* That this subsection shall not become effective or be construed as in force so long as, if given force and effect, it impairs or affects or invades the provisions of any treaty between the United States and any foreign country.

But, as already pointed out, we think the language necessary to give the subsection this construction is not to be found therein, and

it is not claimed to exist elsewhere. Standing alone it does not suggest that the subsection was not intended to take effect *in præsenti.* By the two amendments to the subsection as proposed in the Senate that body was asked to provide for the abrogation of these treaties and in the meantime to withhold the discount from the merchandise imported in vessels of the treaty nations, both of which it refused to do.

We think the irresistible inference to be drawn from this action of the Senate upon the question of amending J, subsection 7, is that it did not intend that the subsection as a whole should be suspended so long as these outstanding treaties remained in force. Clearly, too, the House could not, in view of what already appears, have understood that the subsection would not take effect *in præsenti.* As first enacted in that body it was designed to be in force when the bill became law, and the conference committee reported to the House not that the operation of the subsection was to be deferred until the conflicting treaties were abrogated, but that it should be so construed as not to abrogate or affect any such treaty.

If doubt can still remain as to whether the subsection was intended to take effect *in praesenti,* its meaning may be further tested in the following manner. Suppose at the date of its enactment the only treaty in force containing the reciprocal commercial provision had been the one with Spain, and the proviso to the subsection had read, instead of as now:

*Provided,* That nothing in this subsection contained shall be so construed as to abrogate or in any manner impair or affect the treaty with Spain, ratifications of which were exchanged April 14, 1903.

If this had been the proviso, can it be doubted that the true meaning and intent of the subsection could be readily determined if the reciprocal commercial provision in the Spanish treaty were inserted in the proviso in the following manner:

*Provided,* That nothing in this subsection contained shall be so construed as to abrogate or in any manner impair or affect Article VIII of the treaty with Spain, which provides "that all the articles which are or may be legally imported from foreign countries into ports of the United States, in United States vessels, may likewise be imported into those ports in Spanish vessels, without being liable to any other or higher duties or charges whatsoever than if such articles were imported in United States vessels."

Would anyone, under such circumstances, claim that the discount affirmatively and expressly given to goods imported in vessels of our registry must or could lawfully be refused so long as the Spanish treaty remained in force? We think the clear intent would be that the discount should be allowed to merchandise imported in the vessels of both nations and not that it should be denied to all merchandise until the Spanish treaty was abrogated.

Of course, if this be the sound conclusion as to the Spanish treaty, it applies equally to all the others.

It is clear to us that J, subsection 7, as a whole was intended to make a present discrimination of 5 per cent in favor of merchandise imported in vessels of United States registry. The construction claimed by the Government defeats that purpose not only for the present but, so far as we know, for all time.

It is clear that Congress assumed, as it was advised, that there were outstanding treaties, some provisions of which would be violated and in effect abrogated by the subsection as first enacted by the House. We think it is equally clear that by the proviso it intended, as it declared, that the first part of the subsection should not be *construed* to abrogate these treaties or impair any rights thereunder. The natural force and legal effect of the first part, unmodified, would have been to abrogate or repeal some part of each thereof, and so, to give force and effect to the saving language of the proviso, it must be *construed—i. e., held*—that the treaties are not impaired or abrogated by the first part of the subsection, but are in force. The only way to enforce them is to hold that they are effective to prevent discrimination against merchandise imported in the vessels of the treaty nations. The only way to give force and effect to the first part of the subsection is to allow now the discount to merchandise imported in vessels of our registry.

By this conclusion not only do we give force and effect to all the language of the subsection and hold that the proviso is not repugnant to the body thereof but we also acquit Congress of the charge of having in form enacted a statute which, although clothed in language apt for present enforcement as to all its parts, was, nevertheless, not designed as a statute at all, but was in reality no more than the declaration of a policy.

But it is thought that the word " affect " contained in the proviso, when correctly interpreted, renders untenable the conclusion we have reached. Without undertaking to consider *seriatim* the views presented, it is sufficient for our purpose to say that the word " affect " is recognized as susceptible of more than one meaning, and that the sense in which it is used must be determined by the context as well as the purpose of the statute or other instrument in which it is found.

In Ryan *v.* Carter (93 U. S., 78) there was considered an enactment by Congress, declaring that the rights, titles, and claims to certain lands—

shall be, and the same are hereby, confirmed to the inhabitants of the respective towns or villages aforesaid, according to their several right or rights of common thereto: *Provided*, That nothing herein contained shall be construed to affect the rights of any person claiming the same lands, or any part thereof, whose claims have been confirmed by the board of commissioners for adjusting and settling claims to lands in the said Territory—

It was urged that the force of the word "affect" in this proviso was to exclude from the beneficial purpose of the act the title of a particular individual to certain of the named lands the title to which had been by the commissioners confirmed to him. The court said the confirmation of the title in question became complete and vested in the named person a legal title, valid against the United States and all persons—

unless his case was taken out of the enacting clause by the proviso that the act shall not *affect* any confirmed claims to the same lands. How "affect" them? If in the sense of simply acting upon them, then his title is excepted from the operation of the act. But this exception is not within the reason of the proviso, and the court is at liberty to adopt another construction, if it may be fairly done, by giving full and just effect to the words used. * * * It is unnecessary to give the various definitions of the word "affect." It is enough to say that it is often used in the sense of acting injuriously upon persons and things and in this sense we are all of opinion it was used in this proviso. This interpretation accords with the reason and manifest intent of the proviso.

In Tyler *v.* Wells (2 Mo. Appls., 526) the court reviewed certain acts of Congress evidently designed to confirm certain land titles and which contained provisos that nothing therein should "be construed to affect or impair the rights of any individual," or that nothing herein contained "shall be construed to affect the rights of any person claiming the land." That is, in some of the statutes the words "affect or impair" were used in conjunction and in others the word "affect" only was employed. The court said, "undoubtedly a party may be beneficially affected, as well as injuriously affected by anything, and the word 'affect' standing alone may be said to be equivocal"; that is, as we understand, it might be said to mean to affect injuriously or to affect beneficially. It was held that the context and the purpose of the enactment both consistently required that whether standing alone or in conjunction with the word "impair" the word "affect" should in the case before the court be read in the sense of "to affect injuriously."

In Baird *v.* St. Louis Hospital Association (116 Mo. Rep., 419) a similar question arose, and again the court said the term "affect the rights of" standing alone in a proviso, in view of the object and purpose of the act, to settle land titles, meant to prejudice or injuriously affect.

The case of Lyons *v.* Elston (211 Mass., 478) was a suit in equity by some of the children of a grantor to set aside her deed of real estate to others of her children. The master found that the defendant and one of the plaintiffs—

connived together to induce their mother to make a will in their favor * * * and that she was unduly influenced by them, and that although she of her own volition and with the idea of preventing trouble, which might be occasioned if she left another will, suggested a deed instead, was nevertheless affected at said time by said undue influence.

The question was whether the word " affected " so used in said finding should be interpreted to mean that the grantor was unduly influenced in the making of the deed. There was no dispute as to the meaning of the word " affected " as used, and the court found that the undue influence which was used to cause the grantor to make a will operated to influence her in making the deed in question. Manifestly this was a conclusion that the undue influence operated injuriously to the rights of the orator in the case.

In Clark v. Riddle (101 Iowa, 270) the question was whether the provisions of the special city charter of Cedar Rapids were in anywise limited or enlarged by a general statute known as the mulct law which applied to all cities of over 5,000 inhabitants and contained various provisions touching the sale of intoxicating liquors not granted to that city in its special charter. There was a statute providing that no general law relating to cities organized under the general incorporation act should *affect* cities organized under special charters unless special reference to such cities was made therein. The court found that the mulct law, if applicable, would permit the city to authorize the sale of intoxicating liquors therein, which under its special charter it could not do, and in other respects would enlarge its rights and duties, and held that the provision that a general law should not *affect* a special city charter prohibited the enlargement of the charter in question by the mulct law which did not specially refer to Cedar Rapids. We see nothing in this manifestly sound conclusion that is at variance with the meaning we give to the word " affect " in this case.

Other authorities of the same import may be cited, but it is thought the above sufficiently show what can not be denied, that the meaning to be ascribed to the word " affect " can only be determined in view of its context and the purpose to be accomplished by the statute in which it is employed.

The purpose of the proviso here without doubt was to prevent the abrogation or repeal of treaties, including those in question, and it is, we think, apparent that the intent of Congress (and this has already been pointed out) was to declare that the granting of the discount to merchandise imported in vessels of our registry should not in any way abrogate or impair—which, of course, means to wipe out or injuriously affect—such treaties or rights thereunder; and in that sense we think both reason and authority require the interpretation of the word " affect " here. Its use in conjunction with the word " impair " suggests that interpretation.

It is suggested that the Congress intended that J, subsection 7, should take effect when the interfering treaties had been abrogated by the ratification of substitutes therefor. The Senate, however, had expressly refused to provide for the orderly abrogation of these treaties, as we have already shown.

Congress did not provide therefor, and, as it is primarily clothed with the power so to do, the suggested construction is that it enacted a statute to become operative only upon the termination of treaties which it did not denounce itself and for which it made no provision.

Again, it is said, section 4, A, of the act of 1913 in connection with J, subsection 7, should be interpreted to mean that the President, through diplomatic channels, would cause to be abrogated the offending treaties and that thereupon the provisions for the discount to American shipping would have vitality. Section 4, A, does not authorize the abrogation of any treaty, but does authorize and empower the President " to negotiate trade agreements with foreign nations wherein mutual concessions are made looking toward freer trade relations and further reciprocal expansion of trade and commerce." The treaties under consideration here seem to be precisely of that class, and it is somewhat difficult to believe that by this provision Congress indicated any purpose or expectation that thereunder such existing treaties would be abrogated or terminated. No such results, so far as we can ascertain, have followed the provisions of similar statutes. (See tariff act of 1897, sec. 3.)

It is true that the vitality and force of an act may be made to depend upon a condition to be determined outside the halls of legislation. But such conditions, so far as we can learn, are not left to conjecture, but are definitely stated and the mode of their ascertainment, and announcement if any, distinctly provided for. Field v. Clark (143 U. S., 649, 680, and cases there discussed).

At the most the only inference to be drawn from section 4, A, is that Congress recognized the wisdom of the policy of commercial reciprocity, desired its continuance, and the execution of trade agreements to promote the same.

By providing, however, that any agreements so negotiated by the President should be submitted to it for ratification before becoming effective, Congress, if the claimed view thereof be adopted, gave notice that J, subsection 7, should not take effect until it had further legislated. How easy and simple for Congress, if it intended to suspend the operation of the subsection, to have so expressly declared, instead of submerging that intent in a manner that renders it impossible of easy discovery and when found appears to be neither satisfactory nor certain.

The logic of the interpretation contended for forces its supporters to the conclusion, and admittedly it is required, that so long as any one of the treaties in question is outstanding the subsection is not operative and no merchandise, whether imported from treaty or nontreaty nations, can receive the discount even if imported in vessels of our registry. A construction which leads to that result manifestly is at war with the rule that a proviso shall not be held

to defeat the purview of a statute unless it can be given no other interpretation.

One further suggestion and we have done with this phase of the discussion. It is said that we have failed to give proper effect to the rule that the law-making body will not be presumed to have done a vain thing and have violated the canon that the construction given to the proviso shall not be repugnant to the main body of the statute. As we have already pointed out, it seems to us clear that the intent of Congress was to give present effect to the law providing for the discount, because only thereby can present benefit accrue to our merchant marine. And, indeed, it would be a vain thing for Congress to solemnly declare its purpose to benefit our shipping, enact an appropriate statute to produce that result, and then say after all that the result was defeated by the further terms of the act which are nevertheless naturally susceptible of a construction that can give full force and immediate effect thereto. In this view we have construed the proviso conformably to recognized authority. It was said by Mr. Justice Field in Georgia Railroad and Banking Co. v. Smith (128 U. S., 174) that—

The general purpose of a proviso, as is well known, is to except the clause covered by it from the general provisions of a statute, or from some provisions of it, or to qualify the operation of the statute in some particular. But it is often used in other senses. It is common practice in legislative proceedings, on the consideration of bills, for parties desirous of securing amendments to them to precede their proposed amendments with the term "provided," so as to declare that, notwithstanding existing provisions, the one thus expressed is to prevail, thus having no greater signification than would be attached to the conjunction "but" or "and" in the same place, and simply serving to separate or distinguish the different paragraphs or sentences.

Upon the scope, office, purpose, and interpretation of provisos there are many judicial pronouncements. Their value in any case depends upon the precise question decided or under consideration. The purpose of the court is always to reach a correct understanding of the legislative intent and all canons of construction are designed to promote that end. Of itself a proviso possesses no magical power. In the subsection before us there is found a general enactment providing for a discount of 5 per cent upon certain merchandise to which is added the proviso that nothing therein shall be construed to abrogate or in any manner impair or affect any treaty provisions. The proviso does not suggest that no discount whatever shall be allowed until the happening of certain conditions, but clearly indicates that its allowance shall not be construed to affect treaty rights. The treaties referred to provide that merchandise that may be lawfully imported here in our vessels may also be imported in the vessels of the treaty nations, and that there shall be levied and collected no higher or other duties upon merchandise imported in the one class than in the other. Force is given the purview and the proviso by the

construction we have adopted and we have no hesitation in expressing the view that it clearly carries out the legislative intent.

We have not overlooked the case of Dunlap *v.* United States (173 U. S., 65), which is much relied upon by the Government. The Supreme Court there considered section 61 of the act of August 28, 1894, which we quote:

Any manufacturer finding it necessary to use alcohol in the arts or in any medicinal or other like compound may use the same under regulations to be prescribed by the Secretary of the Treasury, and on satisfying the collector of internal revenue for the district wherein he resides or carries on business that he has complied with such regulations and has used such alcohol therein and exhibiting and delivering up the stamps which show that a tax has been paid thereon, shall be entitled to receive from the Treasury of the United States a rebate or repayment of the tax so paid.

The Secretary of the Treasury made no regulations whatever applicable to the subject matter of this section. A manufacturer sought to recover through the Court of Claims repayment of taxes on alcohol used by him subsequently to the enactment of the statute.

Sustaining the Court of Claims, the Supreme Court held that recovery could not be had. It said the section was one of many relating to taxation of distilled spirits which imposed a higher tax thereon and introduced certain new requirements in regard to re-gauging, etc., the object being to derive more revenue from spirits used as beverages; that—

the general intention to forego the revenue that had been previously derived from spirits used in the arts could only be carried out in consistency with the general tenor of the whole body of laws regulating the tax on distilled spirits, which undertook to guard the revenue at all points, and which required from the officers of the Government evidence that everything had been correctly done. The regulations contemplated by section 61 were regulations to insure the *bona fide* use in the arts, etc., of all alcohol on which a rebate was to be paid and to prevent such payment on alcohol not so used, and these were to be specific regulations under that section, and could not otherwise be framed than in the exercise of a large discretion based on years of experience in the Treasury Department. * * * It seems clear that when Congress undertook to provide for refunding the tax on alcohol when used in the arts it manifestly regarded adequate regulations to prevent loss through fraudulent claims as absolutely an essential prerequisite, and may reasonably be held to have left it to the Secretary to determine whether or not such regulations could be framed, and if so, whether further legislation would be required. It is true that the right to the rebate was derived from the statute, but it was the statute itself which postponed the existence of the right until the Secretary had prescribed regulations, if he found it practicable to do so.

While recognizing the rule that debates are not appropriate sources of information from which to discover the meaning of statutes, the court observed that it was interesting to note that in the Senate upon an effort to amend the bill and prior to the insertion of section 61 therein it was said in support of the section that—

if the Secretary of the Treasury and the Commissioner of Internal Revenue think they can not adopt any regulations which will prevent fraud, then

nothing will be done under it; but if they conclude they can adopt such regulations as will prevent fraud in the use of alcohol in the manufactures and the arts, then there will be relief under it. (26 Cong. Rec., p. 6985.)

It appeared that as soon as the act became law, without the approval of the President, Congress adjourned; that at its first meeting thereafter the Secretary of the Treasury reported a draft of the regulations he desired to prescribe, stating that their enforcement would cost half a million dollars annually for which no appropriation was available, and, therefore, he could not execute the section until Congress took further action; that notwithstanding this information no such action was taken, and finally, in June, 1896, the section was repealed.

Reviewing the question, the court noted the fact that upon such repeal a committee was authorized to consider all questions relating to the use of alcohol in manufactures and arts free of tax. It queried if the Secretary of the Treasury under the circumstances could have been compelled by mandamus to prescribe regulations under the section, in view of the nonaction of Congress upon his report. Considering the claim that by reason of the fact that the exercise of discretionary power was necessarily involved in prescribing the contemplated regulations, mandamus would not lie, the court said:

We think the argument entitled to great weight, and that it demonstrates the intention of Congress to leave the entire matter to the Treasury Department to ascertain what would be needed in order to carry the section into effect. Nothing could have been further from the mind of Congress than that repayment must be made on the unregulated use of alcohol in the arts, if in the judgment of the department, as the matter stood, such use could not be regulated. * * * That this was not the case of a right granted *in præsenti* to all persons who might, after the passage of the law, actually use alcohol in the arts, or in any medicinal or other like compounds, to a rebate or repayment of the tax paid on such alcohol, but that the grant of the right was conditioned on use in compliance with regulations to be prescribed, in the absence of which the right could not vest so as to create a cause of action by reason of the unregulated use.

We are clear that giving to this case full authority upon the precise question decided it is not controlling here. In effect it held that the statute before it, and which it found subject to such interpretation, delegated to another branch of government the determination of whether and when regulations could or should be made to give it effect, and treated such regulations as conditions precedent to any right of recovery or action for repayment thereunder.

The statute before us does not warrant such interpretation. There is no suggestion that before it becomes operative the action of any other department of government must intervene. Its language speaks only in terms of the present, and to hold that it was not intended to take effect *in præsenti* is to impute to Congress an attempt " to keep the word of promise to the ear and break it to the hope."

There still remains in this connection to be considered the argument that the smallness of the discrimination in favor of American shipping which would result from the construction hereinbefore given to the subsection demonstrates the error of our conclusion. Upon that question no evidence was introduced before the board. Counsel for all parties here rely, as the foundation for their claims in this regard, upon statistics compiled by the Department of Commerce with reference to shipping and found in a report entitled "Commerce and navigation of the United States for the year ending June 30, 1913." These statistics show what the respective briefs assume, and we treat the same as relevant, because such is the attitude of all parties with reference thereto, as we understand. The Solicitor for the State Department, Mr. Folk, in his aforesaid letter pointed out that there were no treaty obligations with certain nations which would be infringed by the proposed discount. These nations seem to be Brazil, Chile, China, Dominican Republic, Portugal, Russia, Guatemala, Haiti, Mexico, Nicaragua, Panama, Persia, Peru, Salvador, Siam, Switzerland, Turkey, Uruguay, and Venezuela, and counsel on both sides so assume.

From the statistics referred to it appears that for the year 1913 the merchandise brought into this country by the registered vessels of the below nations was of the following tonnage amounts:

|  | Tons. | Vessels. |
|---|---|---|
| Brazil | 17,462 | 7 |
| Dominican Republic | 1,679 | 12 |
| Mexico | 32,253 | 71 |
| Panama | 2,164 | 9 |
| Portugal | 4,474 | 5 |
| Russia | 114,578 | 31 |
| Uruguay | 1,866 | 2 |
| Venezuela | 887 | 5 |
| Making an aggregate of | 175,363 | 142 |

It is agreed that merchandise imported in the vessels of the countries above named would not be entitled to the 5 per cent discount. There is a disagreement whether merchandise imported in vessels of French registration would be entitled to this discount, the Government claiming it would and the importers insisting that it would not.

The preamble of the French treaty, which was concluded in 1822, recites that it is deemed to be temporary. It contains no favored-nation clause. The only provisions as to commercial reciprocal treatment are found in Articles I, II, and III.

Articles I and II provide that the products of the United States imported in its vessels into France shall pay not exceeding certain specified additional duties above those paid on like articles also produced in the United States when imported into France in French

vessels, with an identical reciprocal provision as to French products imported into the United States in French vessels.

Article III of said treaty provides that no discriminating duties shall be levied on such products by either country when imported for transit or reexportation.

Article VII provides that the temporary convention shall be in force for two years, and even after the expiration of that term until a definitive treaty has been concluded or until the temporary convention has been renounced by either party, and in the absence of such renouncement that the extra duties mentioned in Articles I and II shall, after the two years have expired, be annually diminished one-fourth of their amount. (Malloys Treaties, Conventions, etc., Vol. I, p. 521.)

It is agreed that this treaty has not been renounced.

The Government upon this state of facts assumes that products of France imported into this country in French vessels would be entitled to the discount, but for the purposes of this case we do not so construe the treaty. Articles I and II have by reason of the provisions of Article VII long since expired by their own limitations, and there are no applicable reciprocal provisions in the French treaty now in force except those specified in Article III.

Nothing appears in the case to show that the French treaty is regarded by this Government otherwise than as we conclude, and support for this conclusion is found in the aforesaid letters of Counselor Moore and Solicitor Folk.

From the same statistics it appears that during the year ending June 30, 1913, there were imported into this country from France in 243 French vessels 980,628 tons of merchandise.

The importers claim that merchandise brought into this country in ships of British registry which is not the growth or produce of British territories in Europe is not entitled to the 5 per cent discount. The reciprocal commercial provisions of the British treaty are limited to the products of its European possessions, and it contains no general favored-nation clause.

From the same statistics it appears that the total amount of merchandise imported in some 8,998 British vessels for the year 1913 was over 16,000,000 tons. It also appears that from the British possessions in Europe during the same period there were imported some over 5,000,000 tons, but in vessels of what nationality does not appear, although it may be presumed it was largely in vessels of British registry. Of course, the British direct trade from its European possessions with this country could be no more than this amount. Counsel for importers deduct this amount from the total tonnage, leaving a net tonnage of British ships, of merchandise not the product of British European possessions, of more than 11,000,000 tons brought here in some 7,935 vessels, and claim that such merchandise, if im-

ported since October 3, 1913, would not be entitled to the 5 per cent discount.

An exact ascertainment of the quantity of merchandise imported into this country in British vessels to which the 5 per cent discount could not be allowed should not perhaps be attempted without some examination of what are called the favored-nation clauses which are found in some, but not all, of the treaties. An illustration thereof from the treaty with Prussia is here inserted:

ARTICLE IX. If either party shall hereafter grant to any other nation any particular favor in navigation or commerce, it shall immediately become common to the other party, freely, where it is freely granted to such other nation, or on yielding the same compensation when the grant is conditional.

Another is taken from the treaty with Mecklenburg-Schwerin:

ARTICLE VII. The high contracting parties engage mutually not to grant any particular favor to other nations in respect of navigation and duties of customs which shall not immediately become common to the other party, who shall enjoy the same freely, if the concession was freely made, or on allowing a compensation as near as possible if the concession was conditional.

The Government claims that in view of these favored-nation clauses the claim of the importers is grossly exaggerated as to the amount of tonnage imported in vessels of British registry to which the discount could not be given. It points, for instance, to the Serbian treaty, which is not directly involved in the cases before us, but which in Article VI thereof provides that each of the high contracting parties binds itself with reference to the amount, guaranty, and collection of duties on imports and exports—

to give to the other the advantage of every favor, privilege, or diminution in the tariffs on the import or export of the articles mentioned or not in the present convention that it shall have granted to a third power; also every favor or immunity which shall be later granted to a third power shall be immediately extended and without consideration, and by this very fact to the other contracting party.

The Government claims that Serbian goods brought into the United States in British ships must necessarily enjoy the same favor or immunity as the products of Great Britain in Europe are entitled to receive when brought into this country in British ships, and that the same right attaches to the merchandise of many other treaty nations. It further claims that thereby the amount of merchandise imported in British vessels, although not the product of European British possessions which will not be entitled to the discount, will be so diminished as not perhaps to be worthy of consideration.

The importers reply to this by saying that the Government misconceives the situation; that the effect of J, subsection 7, is to divide all merchandise imported in foreign bottoms into two classes which are, respectively, given or denied the discount, depending upon whether the importing vessel is or is not privileged by treaty—in

other words, that the discrimination relates primarily to the *means or instrumentality of transit* and not to the products; that all products imported in privileged vessels are entitled to the discount and all products not so imported are denied it; that if a nation like Serbia chooses to ship its products into the United States in vessels of a nation not entitled under its treaty to the 5 per cent discount, the favored-nation clause in the Serbian treaty does not render the discount applicable. This contention is enlarged upon and fully discussed.

We do not undertake to determine this legal question.

If we hold with the Government, there is nothing before us from which we can determine with reasonable approximation the amount of such tonnage to which the discount would attach. It is, we think, clear that some of it would not be entitled to the discount. For instance, that which comes in vessels of British registry from countries whose treaties have neither the reciprocal commercial provisions nor the favored-nation clauses therein, and also from countries with which we have no commercial treaties whatever, for we think it may be said of common knowledge, as the Government argues, that British ships " are every-day sights in almost every harbor of the world."

The conceded shipping statistics first stated herein show that in the year ending June 30, 1913, the following importations were made in vessels of nations with which we have no commercial treaties:

|  | Tons. | Vessels. |
|---|---|---|
| Brazil | 17,462 | 7 |
| Mexico | 32,253 | 71 |
| Russia | 114,578 | 31 |
| Total | 164,293 | 109 |

The same statistics show that during that period the total importations from these countries in foreign vessels were as follows:

|  | Tons. | Vessels. |
|---|---|---|
| Brazil | 433,515 | 149 |
| Mexico | 1,173,711 | 693 |
| Russia | 191,004 | 57 |
| Total | 1,798,230 | 899 |

We do not think it unreasonable to assume that no small part of the difference between these two amounts—1,633,937 tons—reached our ports in British bottoms.

It is assumed by counsel for both parties that the total tonnage imported in foreign vessels was for the year ending June 30, 1913, 27,501,410 tons in 13,473 vessels, and importers contend that of this more than 12,000,000 tons, brought in more than 8,000 vessels, were not protected by treaty guarantee. ·

We do not think it is necessary to determine precisely how this may be. It does appear without controversy that 175,363 tons brought in 142 vessels were not so protected, and we hold that the French shipments of 980,628 tons in 243 vessels are in the same class, making an aggregate of 1,155,991 tons in 384 vessels. We have no doubt this amount should be largely increased by the tonnage imported in British vessels.

Under these circumstances can we say that the operation of J, subsection 7, must be suspended because its purpose is not accomplished?

In discussing this question it must be remembered that Congress has not seen fit to specify that any definite amount of merchandise must appear not to be entitled to the 5 per cent discount before the subsection becomes of force, and that the real benefit of the discount depends not only upon the tonnage but also upon the value of the importations, concerning which latter feature no argument is made and no information offered.

Congress will be presumed to have known the facts material to the consideration of this question. Hence it knew when the statute was enacted what benefits would accrue therefrom to our merchant marine, and what might be expected was actually called to its attention. (Cong. Record, vol. 50, pp. 1345–1358.) The enactment of the subsection was the adoption of a policy of discrimination in favor of our vessels. The wisdom or expediency of that policy is a matter into which we may not inquire nor have we the right to suspend the operation of the statute because we may think its purpose is not adequately accomplished. McCulloch v. State of Maryland (4 Wheat., 316, 423), Providence Bank v. Billings (4 Pet., 514, 563), United States v. Union Pacific R. R. Co. (91 U. S., 72), Folsom v. United States (160 U. S., 121), United States v. Freight Association (166 U. S., 290, 340), Texas R. Co. v. Abilene Cotton Oil Co. (204 U. S., 426, 447), Chesapeake, etc., Tel. Co. v. Manning (186 U. S., 238, 245), Field v. Clark (143 U. S., 649).

By the enactment of the statute Congress has indicated that in its opinion there would be a sufficient amount and value of imported merchandise to which the discount would not attach to accomplish its purpose, or at least to try the policy embodied in the new law. It was mindful of the high duty cast upon it to avoid an arbitrary abrogation, without notice, of outstanding treaties, and it would ill become us to say, at least until it is clearly shown that practically no benefits accrue to our shipping thereby, that the present enforcement of the statute shall not be permitted. The law has regard for the future as well as for the present, and who can say what benefits may later flow from the continued enforcement of the law as it is written. Whenever the legislative body discovers its purpose is not

adequately accomplished it will doubtless apply a remedy, but that is its exclusive prerogative.

There is another reason why it should not be held that the quantity of merchandise to be affected by the 5 per cent discount of J, subsection 7, is so small that immediate effect should not be given thereto.

J, subsection 1, provides—

That a discriminating duty of 10 per centum ad valorem, in addition to the duties imposed by law, shall be levied, collected, and paid on all goods, wares, or merchandise which shall be imported in vessels not of the United States, or which, being the production or manufacture of any foreign country not contiguous to the United States, shall come into the United States from such contiguous country; but this discriminating duty shall not apply to goods, wares, or merchandise which shall be imported in vessels not of the United States entitled at the time of such importation by treaty or convention or act of Congress to be entered in the ports of the United States on payment of the same duties as shall then be payable on goods, wares, and merchandise imported in vessels of the United States. * * *

The effect of this provision is, of course, a discrimination in favor of merchandise imported in vessels of our registry, resulting, it is plain, in a discrimination in favor of such vessels. The *quantity* of merchandise receiving the benefit, however, must be substantially identical with the *quantity* which would receive the benefit of the 5 per cent discount under J, subsection 7. By the enactment of J, subsection 1, Congress indicated that it did not deem that quantity so small as to be negligible for the purposes of that subsection, and it can hardly be claimed that the subsection is not operative *in præsenti.*

The provision for the assessment of a duty of 10 per cent ad valorem in addition to the then normal tariff rates upon merchandise not imported in vessels of our registry is not new law. It was enacted at least as far back as 1816, if not before. (3 Stat., 310, sec. 3, p. 313.) It has been reenacted in practically if not all general tariff acts ever since. Such reenactments have, we think, always contained (with perhaps one exception) a proviso that the additional duty should not apply to merchandise imported in vessels not of our registry, entitled by *treaty* or by any act of Congress to be imported here on the payment of the same duties as were then imposed upon the like merchandise when imported in our vessels. That these provisos related directly to such treaty stipulations as we are considering is obvious.

During all this time such provisos appear to have been recognized and construed as of then present force and effect. Customs Regulations of 1857, Chapter IX, also articles 303, 940, and 972; Customs Regulations of 1908, articles 91 and 1055. See also intervening Customs Regulations of 1874, 1884, 1892, and 1899; also T. D. 18915, and the opinion of Justice McKenna, then Attorney General (T. D. 18431).

If for the purpose of assessing the 10 per cent additional discriminating duty for nearly a century and now Congress has not deemed and now does not deem the quantity of merchandise affected thereby so small as to be negligible, how can it be said that the same quantity thereof is negligible for the kindred purposes of J, subsection 7? If sufficient for one purpose it must be so regarded for the other.

We conclude that nothing has been shown which warrants us in holding that J, subsection 7, is not now in force and effect.

As already stated, certain merchandise was brought into this country prior to the enactment of the present tariff law, was placed in bonded warehouse without the then payment of any duty thereon pursuant to the law then in force, and was, after the act of 1913 took effect, withdrawn from such warehouses, the duty paid thereon, the delivery permits therefor issued, and the merchandise itself entered for consumption in this country. Some of this merchandise was imported in vessels of our registry and some in the registered vessels of one or more of the aforesaid treaty nations.

The Board of General Appraisers held that the 5 per cent discount must be denied to all such merchandise, and as to such decisions the importers are appellants.

The language of J, subsection 7, that the discount shall not be allowed on such merchandise "as shall be imported in vessels, etc.," which was held by the board to relate wholly to merchandise thereafterwards brought to this country must be construed in connection with subsection Q, before herein quoted, which provides that on and after the day when the act shall go into effect merchandise previously imported for which no entry has been made, and merchandise previously entered without payment of duty and under bond for warehousing for which no permit of delivery to the importer or his agent has been issued, shall be subject to the duties imposed by this act and to no other duty upon the entry or withdrawal thereof.

As to the duty to be imposed, without regard to the allowance of the 5 per cent discount, it is clear that construed together these subsections require the imposition of duties under the act of 1913. Such is also the meaning of section 3, subparagraph S, already quoted.

The purpose of tariff laws, generally speaking, is to provide that the dutiable status of imported merchandise is to be determined at the time it enters into the commerce of the country. Clearly, with respect to the class of merchandise now under consideration, that time was when entry for consumption was made and delivery permits issued. Marriott v. Brune (9 How., 50 U. S., 619), Fabbri v. Murphy (95 U. S., 191), Hartranft v. Oliver (125 U. S., 525), United States v. Burr (159 U. S., 78, 83–84), American Sugar Co. v. United States (202 U. S., 563), Franklin Sugar Co. v. United States (202 U. S.,

580), Faber *v.* United States (221 U. S., 649), United States *v.* Goodsell (84 Fed., 439), Mosle *v.* Bidwell (130 Fed., 334), United States *v.* Hartwell (142 Fed., 334), American Cigar Co. *v.* United States (146 Fed., 484), Gump *v.* United States (3 Ct. Cust. Appls., 137; **T. D.** 32384).

Now, while J, subsection 7, without reference to subsections Q and S, relates to duties on merchandise *thereafterwards imported*, we think when taken together these provisions should be construed to include merchandise brought here before the passage of the act, under bond for warehousing but which thereafter is entered for consumption. So long as merchandise remains under bond for warehousing in the tariff sense and for assessment of duties, its importation has not been completed. Indeed, it may never be completed; hence warehoused goods are for tariff purposes future importations. (See cases last above cited.)

Nor do we think the fact that J, subsection 7, provides for a *discount* from the otherwise normal duties of the act affects the question, as it simply means that regard must be had to the instrumentality of importation in fixing the amount; that is, the duties to be paid. The policy of the law, as we have seen, is to allow this discount if the merchandise is imported in vessels of our registry, and we think full effect is given thereto, and can only be given by allowing this merchandise to receive that discount. In this way only can all merchandise imported and entered for consumption under the act be given the equality of treatment contemplated by the subsection.

In some of the cases before us tobacco and cigars, the product of the soil or industry of Cuba, were imported in vessels of our registry after the tariff act of 1913 took effect, and the question is, What reduction from the rates of duty thereon, as provided by the act of 1913, shall be allowed?

The determination of this question requires an examination of the Cuban treaty which must be construed in connection with J, subsection 7, and section 4, paragraph B, quoted in the first part of this opinion. The materiality of paragraph B is that it declares that nothing in the act shall be construed to abrogate, impair, or affect the provisions of the Cuban treaty or the act of Congress to execute the same, and that the proviso of Article VIII of said treaty is thereby declared abrogated and repealed.

Article I of the Cuban treaty provides reciprocally that all merchandise the product of the soil or industry of the respective parties which at the time of its negotiation was being imported into the other free of duty should continue to be so admitted into each country.

Article II provides that during the term of the treaty all merchandise not included in Article I " and being the product of the

soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of 20 per cent of the rates of duty thereon, as provided by the tariff act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted."

Article III provides that all merchandise not later enumerated in the treaty and not included in Article I which is the product of the soil or industry of the United States, when imported into Cuba, shall be admitted at a reduction of 20 per cent of the rates of duty thereon as then or thereafter provided in the customs tariffs of Cuba.

Article IV provides for a reduction of the applicable Cuban duty rates of percentages varying from 25 to 40 upon certain merchandise produced in the United States when imported into Cuba.

Article VII provides " that similar articles of both countries shall receive equal treatment on their importation into the ports of the United States and of the Republic of Cuba, respectively."

Article VIII provides that " the rates of duty herein granted by the United States to the Republic of Cuba are and shall continue during the term of this convention preferential in respect to all like imports from other countries, and, in return for said preferential rates of duty granted to the Republic of Cuba by the United States, it is agreed that the concession herein granted on the part of the said Republic of Cuba to the products of the United States shall likewise be, and shall continue, during the term of this convention, preferential in respect to all like imports from other countries." The proviso to Article VIII, which is repealed by said subsection B, is not material to any issue in these cases.   (See Malloy's Treaties, Conventions, etc., vol. 1, p. 353.)

It is agreed that the tobacco and cigars here involved are within the provisions of Article II of the treaty and entitled to the reduction of 20 per cent therein provided, so that the only issue is whether the 5 per cent discount provided in J, subsection 7, shall also be allowed thereon.

The Board of General Appraisers sustained the claim of the importers to such discount.

The Government in substance contends that, if this 5 per cent discount is to be allowed to any importations, nevertheless it can not be allowed to those from Cuba for the following reasons: (a) That it would impair the provision for equal treatment contained in said Article VII of the treaty and in the act of Congress effectuating it which provides in section 2 thereof " that articles of the Republic of Cuba shall receive, on their importation into the ports of the United States, treatment equal to that which similar articles of the United States shall receive on their importation into the ports of the Republic of Cuba " (33 Stat. L., pt. 1, p. 4) ; (b) that if the 5 per

cent discount is allowed it will impair or affect Article II of the Cuban treaty, and (c) that the Cuban treaty confers all the rights which are intended to be conferred with respect to imported merchandise.

The importers claim that as the merchandise is expressly within the language of J, subsection 7, it is entitled to the discount therein provided; that as it is also within the express provisions of Article II of the treaty the reduction must be allowed; and that the allowance of the 5 per cent discount is no violation of the treaty.

We think it is quite apparent that the provisions of the Cuban treaty require, as was held in Faber v. United States (221 U. S., 649, 660), that imports from Cuba shall be given a preferential of 20 per cent from the tariff rates on imports from countries which are foreign to the United States.

We find nothing in the Cuban treaty which expressly prohibits the discount which is granted to merchandise imported in vessels of our registry when such merchandise happens to come from Cuba; nor do we think it is in anywise impliedly forbidden therein.

Surveying this treaty as a whole, it appears that all merchandise being the product of the soil or industry of the one country which was at the time of its negotiation admitted free of duty into the other shall reciprocally so continue; that, excluding the foregoing, all merchandise the product of the soil or industry of Cuba when imported into the United States shall be admitted at a reduction of 20 per cent from the rates of duty provided therefor by the laws of the United States then or thereafter in force; that all merchandise being the product of the soil or industry of the United States not entitled to free entry into Cuba, the duties upon which are not otherwise specifically provided for in the treaty, shall be admitted into Cuba at 20 per cent reduction from the rates thereon as then or thereafter provided by the tariff laws of Cuba; that a considerable list of articles specified in the treaty the product of the soil or industry of the United States, when imported into Cuba, shall enjoy a reduction— some of 25, some of 30, and some of 40 per cent—on the customs duties imposed by Cuba; that tobacco in any form of the United States or its insular possessions shall receive no reduction from the Cuban duty rates when imported therein.

It should be noted that this last above conclusion is based upon Article VI of the treaty which provides that "the tobacco, in any form, of the United States or any of its insular possessions shall not enjoy the benefit of any concession or rebate of duty when imported into the Republic of Cuba."

Restated, these provisions contemplate equal reciprocal treatment as to merchandise entitled to free entry; that as to merchandise, not otherwise provided for, a like treatment is contemplated by allowing

a 20 per cent reduction from the duty imposed thereon by the general tariff laws of the party into whose ports it may be imported from the other; and that as to certain merchandise, the product of the soil or industry of the United States, imported therefrom into Cuba, a favor of more than 20 per cent reduction on the normal tariff rates of Cuba is allowed, while tobacco imported into Cuba from the United States or its insular possessions is to receive no reduction.

This summary brings out clearly the fact that the duties are not in all respects equal and reciprocal. It shows also the reason why they are declared to be preferential and the necessity, in order to execute the preferential purpose, of allowing the 20 per cent reduction to apply to the duties charged on like merchandise when imported from other countries in vessels of our registry.

As to the Government's contention that the allowance of the discount violates Article VII of the treaty and the act of Congress effectuating the same, we think the answer is that those provisions do not relate to the duties to be assessed on imported merchandise by either party; if so, the provision would seem to be in conflict with Article IV of the treaty, which, as we have already pointed out, provides for a reduction of duties larger than 20 per cent on a great many articles of merchandise imported from the United States into Cuba, but which, if imported from Cuba into the United States, would, under Article II, only receive the 20 per cent reduction. It also conflicts with Article VI, which provides that tobaccos imported from the United States or its insular possessions into Cuba shall receive no reduction. Doubtless the intent of Article VII was to provide that in all matters other than the determination of customs duties equal treatment, freedom, and privileges should be accorded to the merchandise of the respective parties in the ports of the other. But even admitting the Government's interpretation of Article VII, the allowing of the 5 per cent discount on goods imported in vessels of our registry would not be a violation of the article because the proviso to J, subsection 7, as we have held, gives a like allowance to merchandise imported in the registered vessels of other nations whose treaties contain the necessary reciprocal provision, and Article VII must be given such reciprocal force if it be construed as contended for by the Government.

The Government's second contention may be answered by saying that Article VI of the Cuban treaty expressly negatives the idea that reciprocal treatment shall be accorded to tobaccos imported from one country into the other, while Article II requires the 20 per cent reduction to be allowed on the tobaccos imported from Cuba into the United States, and we have already held that the duty to be assessed on merchandise imported in this way must be ascertained by deducting the 5 per cent discount, and if on the amount so determined the

20 per cent reduction is allowed, the intent of Article II is fully accomplished.

The Government's third contention may be answered by saying that the entire treaty contemplates, and in Article VIII it is expressly declared, that the rates of duty therein provided for are preferential in respect to all like imports from other countries, and as the duty from other countries on merchandise imported in our registered vessels and imported in vessels of the registry of the nations whose treaties contain the reciprocal commercial provision is entitled to the 5 per cent discount, the preferential rate can be given to Cuba only by allowing the 20 per cent reduction to apply to the duty as ascertained in our ports after the 5 per cent discount has been taken therefrom, for it is plain that unless both discounts be allowed upon the merchandise involved in these importations the preferential which is really allowed to Cuba is not more than 15 per cent.

We are of opinion that the proper duty to be collected upon these importations from Cuba is to be determined by first deducting the 5 per cent discount allowed thereon because of its importation in vessels of our registry, and from the sum thus obtained to make a further reduction of 20 per cent in accordance with the stipulations of the Cuban treaty. In this manner, and in this manner only, can effect be given to both our statute and the Cuban treaty.

In disposing of this issue we have undertaken to apply the rule that treaties are to receive a fair and liberal interpretation in a spirit of utmost good faith, in a manner to carry out their manifest purpose, and that when susceptible of two interpretations, one restrictive as to rights that may be claimed under it and the other liberal, the latter is to be preferred. Wooster v. Georgia (6 Pet., 575, 582), Hauenstein v. Lynham (100 U. S., 483), Tucker v. Alexandroff (183 U. S., 424), Johnson v. Browne (205 U. S., 309).

We think any lengthy discussion of the constitutional question here is unnecessary. Treaties containing these reciprocal commercial or other provisions, the effect of which was to regulate commercial intercourse or to modify or control the collection, amount, or rate of tariff duties, have been considered by the Supreme Court on many occasions. Never, so far as we are aware, has that tribunal directly passed upon the question as to whether in the particular case the exercise of the now challenged power was or was not constitutional. It has been careful to say on one occasion that whether Congress was constitutionally bound to make an appropriation to carry out the terms of a treaty was expressly reserved from its decision, but no doubt was expressed as to the power to make the treaty. De Lima v. Bidwell (182 U. S., 1, 198).

In several of the cases, if the treaties under consideration had been deemed unconstitutional, they could have been disposed of upon that

ground alone and a discussion of other questions would thereby have become unnecessary. Among this class of cases are Oldfield *v.* Marriott (10 How., 51 U. S., 146), Olsen *v.* Smith (195 U. S., 332), Bartram *v.* Robertson (122 U. S., 116), and Whitney *v.* Robertson (124 U. S., 190).

In United States *v.* Forty-three Gallons of Whiskey (93 U. S., 188), Same *v.* Same (108 U. S., 491), Fourteen Diamond Rings *v.* United States (183 U. S., 176), Cross *v.* Harrison (16 How., 57 U. S., 164), United States *v.* Johnson (124 U. S., 236), Head Money Cases (112 U. S., 598), United States *v.* Lee Yen Tai (185 U. S., 213), the *Peggy* (1 Cr., 103), Foster *v.* Neilson (2 Pet., 314), *In re* Ross (140 U. S., 453), Geofroy *v.* Riggs (133 U. S., 258), Hauenstein *v.* Lynham (100 U. S., 483), Fort Leavenworth, etc., *v.* Lowe (114 U. S., 525), Chew Heong *v.* United States (112 U. S., 536), various aspects of treaties and the scope and extent of the treaty making power as expressed in the Constitution are considered and discussed, but in none is it intimated that the exercise of that power is limited by the Constitution as held by the Board of General Appraisers. The above list does not exhaust but illustrates the cases.

From the earliest history of our Government under the present Constitution it is clear that the treaty-making power has negotiated and ratified treaties containing these reciprocal commercial provisions. In addition to those involved in these cases such provisions may be found in treaties with the following countries: Brazil, 1825; Venezuela, 1836; Greece, 1838; the two Sicilies, 1856; the Ottoman Empire, 1862; Salvador, 1874; and there are others.

The power to make, the beginning, growth, and development of the policy of these reciprocal commercial treaties is clearly set forth in Moore's Digest of International Law, volume 5, page 162, *et seq.*

It was thought by the board that such treaties were unconstitutional in that they invaded the constitutional prerogative of Congress. It may be observed, and the fact has already been referred to at some length in another connection, that since at least as early as 1816 there have been statutes in force substantially if not all the time providing for an additional or discriminating duty of 10 per cent ad valorem in addition to the normal duties otherwise imposed by then tariff acts upon all merchandise imported in foreign vessels, with a proviso that such additional duty shall not apply to goods, wares, and merchandise imported in ships or vessels not of the United States, *entitled by treaty* or by any act or acts of Congress to be entered into the ports of the United States on the payment of the same duties as are paid on goods, wares, and merchandise imported in ships or vessels of the United States, and this provision is also found in J, subsection 1, of the act of 1913. In the tariff act of

1897 (30 Stat., 209) the proviso is limited to merchandise imported in foreign vessels entitled by *treaty or convention* to be entered in our ports, etc.; in other words, leaving out the otherwise uniform provision for an exemption by virtue of our statutes as well as treaties.

It was said by Justice McKenna, then Attorney General, in 1897, in an opinion furnished by him to the Treasury Department (T. D. 18431) that "a law imposing discriminating duties has been on the statute books in some form from the enactment of the first tariff bill." The question considered in that opinion involved an examination of one of the statutes containing the above additional or discriminating duty provision, and the exempting proviso. See also the opinion of the Board of General Appraisers by Somerville, G. A. (T. D. 18915).

It is hardly necessary to state that these provisos exempting merchandise in vessels of treaty nations from such discriminating duties relate expressly to the class of treaties under consideration, because they alone contain the provisions that justify and give force to the language of the proviso.

We are aware of no action on the part of Congress indicating any claim on its part that such treaties were an invasion of its power, although we are not unaware that the Senate and House of Representatives have been at variance upon this question.

The Treasury Department, in the enforcement of tariff laws, has from the date of its earliest printed volume of regulations, 1857, and we have no doubt from the date of the first tariff act, recognized and enforced these reciprocal commercial provisions as the law of the land, knowledge and not ignorance of which fact must be imputed to Congress. (See the following Customs Regulations, 1857, arts. 303, 940, and 972; 1874, art. 495; 1884, arts. 252, 269, 573, and 574; 1892, art. 904; 1899, art. 1434; 1908, art. 1055. See also T. D. 18915, and also the opinion of Justice McKenna in T. D. 18431.)

It is said in Story on the Constitution, fifth edition, section 1508, that—

The power "to make treaties" is by the Constitution general; and of course it embraces all sorts of treaties, for peace or war, for commerce or territory, for alliance or succors, for indemnity for injuries or payment of debts, for the recognition and enforcement of principles of public law, and for any other purposes which the policy or interests of independent sovereigns may dictate in their intercourse with each other. But though the power is thus general and unrestricted, it is not to be so construed as to destroy the fundamental laws of the State. A power given by the Constitution can not be construed to authorize a destruction of other powers given in the same instrument. * * * A treaty to change the organization of the Government, or annihilate its sovereignty, to overturn its republican form, or to deprive it of its constitutional powers, would be void; because it would destroy, what it was designed merely to fulfill, the will of the people.

And in section 1509:

The power of making treaties is indispensable to the due exercise of national sovereignty, and very important, especially as it relates to war, peace, and commerce.

(See also Watson on the Constitution, vol. 2, p. 955, and Butler's Treaty Making Power of the United States, vol. 2, sec. 430.)

From this somewhat incomplete survey of the entire situation we conclude that the challenged authority of the treaty-making power has always been exercised by it; that the constitutionality thereof has never been denied by the Supreme Court, although *opportunity* so to do has presented itself; that Congress has always recognized and acquiesced therein; that the executive departments of the Government have all assumed and proceeded upon the theory that such power had been constitutionally exercised.

We are of opinion that, considering the constitutional challenge alone, these treaties are clearly within the right of the treaty-making power to negotiate and ratify, and that when duly proclaimed in accordance with their terms they are until denounced or until they expire by their own limitation, or are by express or necessary implication repealed by act of Congress, operative and in force as the law of the land.

If there were doubts as an original question upon this claim, we think the case of United States *v.* Midwest Oil Co. *et al.*, heard by the Supreme Court at its October term, 1914, and decided February 23, 1915, is of pertinent application, and we quote one paragraph of that opinion.

But government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the executive department—on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation.

There remains, however, for discussion the question as to whether or not these treaties are self-executing. By the Board of General Appraisers they were held not to be such, and it is thought by some that the board should be sustained upon this issue. Whether or not a treaty is self-executing depends upon whether it is operative *ex proprio vigore*, or whether it requires some legislation to make it effective. This rule has long been established. Foster *v.* Neilson (2 Pet., 253, 314), the Chinese Exclusion cases (130 U. S., 600), Bartram *v.* Robertson (122 U. S., 116), Whitney *v.* Robertson (124 U. S., 190), Shaw *v.* United States (1 Ct. Cust. Appls., 426; T. D. 31500), American Express Co. *v.* United States (4 Ct. Cust. Appls., 146; T. D. 33434).

At the outset it may be doubted whether, in view of the Government's concession and claim, we are justified in an extended discussion of this question. The Government says, quoting from its brief:

It is no longer material whether the treaties were originally executory or self-executing. Congress long since enacted legislation which executed all of the treaties which were merely executory, and by the proviso to subsection 7 Congress expressly stated its intent to respect all the treaties.

And, again, referring to the case of Terlinden v. Ames (184 U. S., 270), where a Prussian treaty regulating extradition and claimed to be of no force because subsequent to its ratification Prussia had been merged into the German Empire was held by the Supreme Court to be in force pursuant to the recognition thereof by the executive department, the Government here says:

By a parity of reasoning, therefore, we may say of the treaties now under discussion that if the departments of our Government which are intrusted with the foreign intercourse of the Nation have recognized the existence and validity of these treaties, and if Congress has acted and has forbidden any construction of subsection 7 which would abrogate, impair, or affect them, it would be an anomaly to have an opposite construction maintained in the courts. It would be monstrous for a court to assert that the treaties were so inoperative that no attention need be paid to their requirements. Yet this is just what the Board of General Appraisers has done. They have placed themselves at odds both with Congress and with the treaty-making branch of the Government. They have construed the act as if it had no proviso. This is utterly inadmissible.

It would seem when one party to contracts which have been in existence for periods varying from a century to not less than 12 years, and which by both parties have during all the same time been recognized as valid and of binding force, asks that such contracts continue to be so regarded by the courts that occasion should not be taken to declare the same invalid and of no force unless a different conclusion is legally impossible. There is force in the Government's statement that it would be monstrous for a court now to deny their legality.

The case of Charlton v. Kelly (229 U. S., 447) is somewhat in point. There Charlton sought to avoid extradition to Italy. He claimed that the United States was not bound to deliver him to the Italian authorities to be tried for a crime charged to have been committed in Italy, in substance, because, under the extradition treaty with that Kingdom which reciprocally provided for the delivery, by either treaty party to the other, of persons convicted or charged with certain crimes committed within the jurisdiction of one of the contracting parties, Italy had refused to deliver up Italian subjects charged with the commission of the prescribed crimes in the United States upon the request of this country. Following a careful discussion of the subject of extradition treaties, the court said, at page 469 :

We come now to the contention that by the refusal of Italy to deliver up fugitives of Italian nationality the treaty has thereby ceased to be of obligation on the United States.

Then followed statements to the effect that although Italy's attitude was a violation of the treaty obligation and would have justified the United States in denouncing the treaty, that it was nevertheless valid here until its abrogation was declared by the United States. The court found that the political branch of our Government recognized the treaty obligations as in force, and held that such interpretation of the treaty was binding upon the courts, saying in the closing paragraph of the opinion that—

The executive department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender the appellant as one imposed by the treaty as the supreme law of the land and as affording authority for the warrant of extradition.

So it might be said here that, inasmuch as the political branch of our Government has recognized and does recognize these treaties as self executing or executed and the reciprocal commercial provisions as in force, not only this but protests against any other interpretation thereof, that the court should accede to that view. Especially is this so when the other litigating parties whose rights are in question here make the same claim. In this connection, see In re Thomas (12 Blatch., 370), Terlinden v. Ames, supra.

We proceed to consider the case of Taylor v. Morton (23 Fed. Cases, 784), which is often regarded as a leading authority on the question of self-executing treaties, cited by the board.

The question *decided* there was that a Federal statute, enacted *subsequently* to a treaty, abrogated or repealed so much of the treaty as was inconsistent therewith. There is no doubt as to the correctness of this holding. The treaty provision reviewed in that case was not like those under consideration here. It was Article VI of the Russian treaty of 1832, providing that—

No higher or other duties shall be imposed on the importation into the United States of any article, the produce or manufacture of Russia; and no higher or other duties shall be imposed on the importation into the Empire of Russia of any article, the produce or manufacture of the United States, than are or shall be payable on the like article, being the produce or manufacture of any other foreign country.

The statute of 1842 imposed a duty of $40 per ton on hemp, excepting Manila, Suera, and other hemps of India, on which a duty of $25 only was to be levied. The sole issue was that of law as to whether, in view of the language of the tariff act, the statute or the treaty regulated the duty rate, and the greater part of the court's opinion was devoted to that question. The act contained no provision saving or excepting the rights under the treaty provision in

question and it was justly decided that the law superseded the treaty and that the rates provided in the statute controlled the importation. In passing it should be noted that no such question is presented here, because the reciprocal commercial provisions provide in fact that whatever tariff rates are established by the statute such rates apply to the merchandise imported by the treaty nations in their own vessels. In other words, the treaties here, disregarding for the moment J, subsection 7, provide for the assessment of the *same* duties as are fixed under the general law. But after having *decided* the case the learned judge took occasion to indulge in further discussion in which he said " the truth is that this clause in the treaty is merely a contract addressing itself to the legislative power." As the matter then stood this statement was exact. The legislative department had not refrained from imposing higher duties upon Russian hemp than upon certain hemps of India; in that status the treaty could have and did have no other vital force left than that of a contract addressing itself to the legislative body, and any claim accruing by reason of the invasion of the treaty provisions by the statute addressed itself to the executive and not to the judiciary. Of the soundness of this conclusion there is no question.

While it is often claimed that this case was affirmed in the Supreme Court with respect to *all* that was said therein, it should be here noted that although the *judgment* was affirmed (see Taylor *v.* Morton, 67 U. S., 481), it was wholly upon a question of practice and not on the merits. Whatever may have been the proper interpretation of the provisions of the Russian treaty, if not repealed by any statute, we think the Supreme Court has indicated that treaty stipulations like those before us are self-executing.

In Bartram *v.* Robertson (122 U. S., 116), the court considered the effect of the following provisions of the Danish treaty of 1826:

ARTICLE I. The contracting parties, desiring to live in peace and harmony with all the other nations of the earth, by means of a policy frank and equally friendly with all, engage, mutually, not to grant any particular favor to other nations in respect of commerce and navigation which shall not immediately become common to the other party, who shall enjoy the same freely if the concession were freely made, or upon allowing the same compensation if the concession were conditional.

ART. IV. No higher or other duties shall be imposed on the importation into the United States of any article the produce or manufacture of the dominions of His Majesty the King of Denmark; and no higher or other duties shall be imposed upon the importation into the said dominions of any article the produce or manufacture of the United States than are or shall be payable on the like articles, being the produce or manufacture of any other foreign country.

A treaty had been concluded in 1875 between this country and the Hawaiian Islands which the court found to have been executed for valuable reciprocal concessions which were absent in the case of the Danish treaty. Under the Hawaiian treaty certain merchandise was

entitled to free entry when imported from that kingdom, and the same favor was claimed for like Danish merchandise under the quoted provisions of that treaty, although the general tariff laws fixed a duty upon such merchandise and contained no exception referable to the Danish treaty. The Hawaiian treaty had been ratified by an act of Congress. The court held that such provisions as were in the quoted parts of the Danish treaty—

even if conceded to be self-executing by the way of a proviso or exception to the general law imposing the duties, do not cover concessions like those made to the Hawaiian Islands for a valuable consideration. They were pledges of the two contracting parties—the United States and the King of Denmark—to each other that in the imposition of duties on goods imported into one of the countries which were the produce or manufacture of the other there should be no discrimination against them in favor of goods of like character imported from any other country. They imposed an obligation upon both countries to avoid hostile legislation in that respect. But they were not intended to interfere with special arrangements with other countries founded upon a concession of special privileges. The stipulations were mutual, for reciprocal advantages. "No higher or other duties" were to be imposed by either upon the goods specified; but if any particular favor should be granted by either to other countries in respect to commerce or navigation, the concession was to become common to the other party upon like consideration; that is, it was to be enjoyed freely if the concession were freely made, or on allowing the same compensation if the concession were conditional.

The treaty with the Hawaiian Islands makes no provision for the imposition of any duties on goods the produce or manufacture of that country imported into the United States. It stipulates for the exemption from duty of certain goods thus imported in consideration of and as an equivalent for certain reciprocal concessions on the part of the Hawaiian Islands to the United States. There is in such exemption no violation of the stipulations in the treaty with Denmark; and if the exemption is deemed a "particular favor," in respect of commerce and navigation, within the first article of that treaty, it can only be claimed by Denmark upon like compensation to the United States. * * * When such compensation is made it will be time to consider whether sugar from her dominions shall be admitted free from duty.

In the case of Whitney v. Robertson (124 U. S., 190) practically the same question was considered and the same conclusion reached. There it was again announced that a subsequent statute repealed a prior inconsistent treaty.

It is entirely clear that in these cases the Supreme Court held that the general favored nation clause in a treaty did not operate to bring within its scope special concessions granted to other nations for a compensation or consideration and it refrained from deciding whether, if compensation were tendered for the same favors by the other party, the favored nation clause would entitle it to the like privilege; and it also expressly refrained from saying, although it had the question in mind, whether or not the treaties in those cases were or were not self-executing:

In the case of Oldfield v. Marriott (10 How., 51 U. S., 146), the Supreme Court considered a case involving some of the same treaty provisions that are now before us. The act of July 30, 1846, exempted from duty tea and coffee when imported directly from the place of their growth or production in American vessels or in foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges.

The Portuguese treaty made in 1840 (8 Stat., 560, art. 2) provided that vessels of either country arriving in the ports of the other should be treated there upon the same footing as national vessels coming from the same place with respect to the duties or tonnage, etc., levied upon vessels of commerce.

It was claimed by importers under these provisions of the statute and treaty that tea and coffee imported in Portuguese vessels but not of Portuguese production were entitled to exemption from a discriminating duty of 10 per cent ad valorem imposed by the act of August 30, 1842, section 11, which is a statute containing one of the 10 per cent additional or discriminatory duty provisions hereinbefore referred to.

The court pointed out that the reciprocal treaty stipulations invoked related to an entire reciprocity of duty and charges upon *vessels* of the two respective nations and did not relate to merchandise imported therein.

It then proceeded to discuss articles 3, 4, 5, 6, and 13 of the treaty, of which it said in substance that articles 13 and 3 provided that neither nation should grant to any other a particular favor in navigation or commerce that should not become common to the other party upon the same terms, and that the productions of either nation were entitled to admission into the ports of the other upon payment of the same duty as would be payable thereon if they were the growth of any other foreign country; that by virtue of these two provisions no prohibition could be put upon the importation or exportation of articles from either country other than was charged upon like articles exported to any other foreign country; that under articles 4, 5, and 6 both nations could carry in their vessels the productions of each into the other upon the same terms, and in concluding its discussion of these and other articles it said:

From all this it must be seen that neither nation has a right by the treaty to carry in its vessels to the ports of the other the produce of foreign countries except upon the payment of such duties, discriminating and otherwise, as each nation may impose.

The court also alluded to the fact that both nations had evidently so understood and had so applied these treaty stipulations. It denied the claim of importers, and in the course of further discussion, as supporting its conclusion, adverted to the fact that when the act

of July 30, 1846, was passed there were outstanding commercial treaties with 24 nations, among which it named Austria, Prussia, Sweden, Hanover, and the Hanseatic cities. It will be observed that the treaties involved in the cases now before us were made before July 30, 1846, and we conclude they are the identical treaties referred to by the court, and of which, with others, it then proceeded to say, they—

had acceded to the most liberal and extended basis of maritime and commercial reciprocity. They admit our vessels to enter their ports, whether coming from the United States or any other foreign country, laden or in ballast—whether laden with the produce of the United States or of any other foreign country—paying the same tonnage duties and charges as national vessels. * * * They admit the produce of the United States to entry, either for consumption or for reexportation, on payment of the same duties and charges as similar articles the produce of any other foreign country pay when imported in American or national vessels; and the production of other foreign countries likewise, on payment of the same duties and charges, whether imported in American or national vessels and whether coming from the United States, the country of production, or any other foreign country.

The opinion, after referring to other matters not important here, proceeds thus:

Having shown that there are nations which have a right by treaties to bring into our ports in their vessels the produce of foreign nations from the places of their production upon the same terms that our own vessels may import them, the act exempting coffee from duty when brought in American vessels direct from the place of its growth, or when brought by foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties, tonnage, and other charges, has a plain intention and certain application. Its terms are no longer doubtful. No room is left for interpretation. The nations to which it applies are known.

In this opinion it is true that the court did not allude to the question of whether any of the treaties were or were not self-executing, but it is entirely clear that they were assumed to be so, and, considering the length and exhaustiveness of the opinion, we can not for a moment believe that the court overlooked this question. It must be regarded not only as an approval of the authority of the treaty-making power to negotiate the treaties here under consideration but also as an authority that such treaties and the stipulations thereof before us are self-executing.

In Olsen v. Smith (195 U. S., 332) among other questions the court considered whether a Texas statute regulating pilotage was an invasion of the provisions of our present treaty with Great Britain, already herein referred to, that—

No higher or other duties or charges shall be imposed in any of the ports of the United States on British vessels than those payable in the same ports by vessels of the United States; nor in the ports of any of His Britanic Majesty's territories in Europe on the vessels of the United States than shall be payable in the same ports on British vessels.

It was held that the statute was not in conflict with that provision of the treaty. It will be noticed that the quoted stipulation provides for the reciprocal treatment of vessels only. But its language, except that it relates to the charges upon vessels instead of the merchandise imported therein, is practically identical with the reciprocal commercial provision of the British treaty involved in these cases.

It is again true that the court did not discuss the question as to whether or not the treaty provision was self-executing; it did, however, by holding that the State statute was not in conflict with the treaty, recognize that the treaty was in force as law. Had the court considered this provision as not operative, because executory only, there was no occasion to hold that the statute did not conflict therewith. A conflict of this kind occurs only when two or more provisions *in force* are found to exist. Manifestly the court thought the treaty valid and self-executing. If so in that case it would seem to be so here.

It must be remembered in considering the self-executing question that there is no issue as to the authority of the treaty-making power to negotiate these treaties, because whether or not treaties are self-executing is simply a question as to whether or not they require further legislation to give effect thereto. Their validity and binding force in all other respects is assumed. The difficulty lies in determining whether the legislation is necessary. It is of some significance here that until now it does not seem to have been thought necessary to so execute these treaties, and no litigant or treaty party now so thinks.

In Davis *v.* Burke (179 U. S., 399), the Supreme Court considered whether or not a clause of the constitution of Idaho was self-executing, and as indicative of the exact meaning of the term "self-executing," we quote from what was said on the subject in that case:

Where a constitutional provision is complete in itself it needs no further legislation to put it in force. When it lays down certain general principles, as to enact laws upon a certain subject or for the incorporation of cities of certain population or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution.

And in this connection the court cites, with approval, from Cooley's Constitutional Limitations, as follows:

A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected or the duty imposed may be enforced.

We see no reason why this last statement of the rule is not applicable and may not properly be applied to the treaties here. They supply a sufficient rule for the assessment of the duty upon the merchandise imported in the vessels of the foreign treaty nations because they stipulate that it shall be the same as that imposed upon like

merchandise imported in our vessels, and as to the rates and amounts of such duties the statute makes explicit provision.

We do not understand it is claimed that to be self-executing, treaties of this nature must prescribe a code for their enforcement, but that it is sufficient if provisions therefor are found in the statutes. Such seems to be the settled law. United States v. Forty-three Gallons of Whisky (93 U. S., 188), Same v. Same (108 U. S., 491), Fourteen Diamond Rings v. United States (183 U. S., 176, 184), Cross v. Harrison (16 How., 57 U. S., 164), De Lima v. Bidwell (182 U. S., 1, 192).

It is proper to consider what enactment of Congress was or is necessary to give force to the provisions of these treaties. There is no uncertainty as to the merchandise to which they relate, neither is there uncertainty as to the duties to be levied and assessed thereon. The most that Congress could do would be to enact an affirmative statute specifically providing for the assessment of the same rates on merchandise when imported in vessels of the foreign treaty nations as those imposed upon like merchandise imported in our vessels. If this were necessary, it would seem that with each succeeding tariff enactment it would be equally necessary for Congress to again enact a like confirmatory statute, if in the subsequent act such rates were changed, because we must not forget that the question now is not whether the provision is *valid* but whether it supplies a sufficient rule by means of which the right given may be enjoyed or protected or the duty imposed enforced. It seems sound and correct to say that each treaty here establishes the right to the same duties as are imposed on merchandise imported in our vessels and for the precise rate thereof refers to the statute which fixes the same. So applied there is no necessity of confirmatory legislation. The treaty immediately adapts itself to each change in our tariff statutes, varying the rates of duty as they are varied thereby, and is never in conflict therewith. It answers the natural meaning of " self-executing "; it operates of its own force upon the changing conditions produced by changes in our tariff laws.

The question involved upon this phase of the case is similar to that before this court in American Express Company v. United States (4 Ct. Cust. Appls., 146, at 159; T. D. 33434), where, by Montgomery, Presiding Judge, the principles applicable to the determination of whether or not a treaty is self-executing were carefully considered. Although the treaty provisions in question here are different (in that case it was the favored nation clause), nevertheless what was said there is illuminative of the issues here and is referred to with approval.

In an opinion rendered by the Attorney General to the Secretary of State, January 12, 1915, touching the authority of the Secretary

of the Treasury to permit the importation of foreign cattle into this country, the favored-nation clause of the treaty between New Granada, now Colombia, and this country was considered in connection with a subsequent statute allowing particular favors to such importations from Mexico, the question being whether, by virtue of the favored-nation clause, Colombia was entitled to the same privileges accorded to Mexico by the statute. It was concluded that the favored-nation clause *ex proprio vigore* operated to give to Colombia the particular privileges which Mexico enjoyed under the statute, a conclusion precisely in line with that reached in the case of American Express Company *v.* United States, *supra.*

Referring now to both the constitutional and self-executing questions, it may be said of these treaties that the most of them are hoary with age, and the particular provisions of all of them under consideration here are familiar acquaintances in fact or in principle of the executive, legislative, and judicial officers of the Government, past and present. By no department of government have these provisions ever been repudiated or denounced as unconstitutional or denied force and effect as executory merely, so far as we can ascertain. On the contrary, they have during all the time since their negotiation been recognized, respected, and enforced. To now hold them invalid for any reason, in view of these circumstances, would in any event be to assume a grave responsibility, and to defeat them in the face of the contention of the Department of State, the Treasury Department, and the Department of Justice would be little less than usurpation. Fortunately, the duty of repudiating them can by no stretch of authority rest with us, for the very statute which we are now construing in terms recognizes their existence and binding force and declares in effect that they shall not thereby be abrogated or in any manner affected or impaired. It is a matter of some gratification to know that the executive departments of our Government uncompromisingly insist that our treaties shall be observed by us.

We think these treaties are self-executing and that they have been so recognized in each and every of the tariff statutes passed since their ratification and promulgation by virtue of the proviso to each of the statutes imposing the 10 per cent additional or discriminating duty. We also think, for the purpose of determining the issues here, they were likewise so recognized by the proviso to J, subsection 7. If this conclusion be unsound it is also clear to us that the effect of the proviso is to say, if any outstanding treaties, whether the same be self-executing or not, make provision for the assessment of duty upon merchandise imported in the vessels of the treaty nations, which provision would be invaded by the allowance of a 5 per cent discount upon like merchandise imported in our vessels, that there

shall be allowed the same discount to the merchandise imported in vessels of the treaty nations. In other words, without reference to the question of whether these treaties are or are not self-executing, the provisions therein for the assessment of duty upon merchandise imported in vessels of the treaty nations is made by statute to control. That is, the statute makes the treaty a part of itself.

Restating the conclusions already reached, we are of opinion—

(1) That the merchandise involved in these cases, imported in the registered vessels of the United States, is entitled to the 5 per cent discount as held by the board, whose judgment relating thereto is hereby affirmed.

(2) That as to the merchandise imported in the registered vessels of the said treaty nations, both that which was imported and entered for consumption subsequent to the taking effect of the tariff act of 1913, as well as that which was brought to our ports prior thereto and entered in bond for warehousing, subsequently withdrawn for consumption and duties paid, the 5 per cent discount must be allowed, and with respect to such merchandise the judgment of the Board of General Appraisers is reversed.

(3) That the merchandise imported in vessels of our registry before the tariff act of 1913 took effect which was entered in bond for warehousing, subsequently withdrawn and entered for consumption and duties paid, is entitled to the 5 per cent discount thereon, and the judgment of the board with respect thereto is reversed.

(4) That the merchandise from Cuba is entitled to the reduction of 20 per cent ad valorem provided by the Cuban treaty and the further discount of 5 per cent ad valorem from the amount so ascertained. As to such importations, the judgment of the Board of General Appraisers is affirmed.

MONTGOMERY, Presiding Judge, SMITH, and MARTIN, Judges, concur.

---

DISSENTING OPINION.

DE VRIES, *Judge:* The issues are aptly stated in the majority opinion. I am regrettably not in accord therewith and respectfully submit the following considerations:

The tariff act of 1913, among other matters, enacted in the order below recited certain provisions, which, together with treaty Article I of the treaty of 1852 with Netherlands (10 Stat., 982), also quoted, fairly present the laws to be construed:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That on and after the day following the passage of this act, except as otherwise specially provided for in this act,

there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands and the islands of Guam and Tutuila) the rates of duty which are by the schedules and paragraphs of the dutiable list of this section prescribed, namely:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Paragraphs 1 to 386 levy duties at prescribed rates upon certain described imported merchandise.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

SECTION IV. A. That for the purpose of readjusting the present duties on importations into the United States and at the same time to encourage the export trade of this country, the President of the United States is authorized and empowered to negotiate trade agreements with foreign nations wherein mutual concessions are made looking toward freer trade relations and further reciprocal expansion of trade and commerce: *Provided, however*, That said trade agreements before becoming operative shall be submitted to the Congress of the United States for ratification or rejection.

B. That nothing in this act contained shall be so construed as to abrogate or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on the eleventh day of December, nineteen hundred and two, or the provisions of the act of Congress heretofore passed for the execution of the same except as to the proviso of article eight of said treaty, which proviso is hereby abrogated and repealed.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

J. Subsection 1. That a discriminating duty of 10 per centum ad valorem, in addition to the duties imposed by law, shall be levied, collected, and paid on all goods, wares, or merchandise which shall be imported in vessels not of the United States, or which, being the production or manufacture of any foreign country not contiguous to the United States, shall come into the United States from such contiguous country; but this discriminating duty shall not apply to goods, wares, or merchandise which shall be imported in vessels not of the United States entitled at the time of such importation by treaty or convention or act of Congress to be entered in the ports of the United States on payment of the same duties as shall then be payable on goods, wares, and merchandise imported in vessels of the United States, nor to such foreign products or manufactures as shall be imported from such contiguous countries in the usual course of strictly retail trade.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

J. Subsection 7. That a discount of 5 per centum on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States: *Provided*, That nothing in this subsection shall be so construed as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation.

Netherlands treaty of 1852 (10 Stat., 982): Art. I. Goods and merchandise, whatever their origin may be, imported into or exported from the ports of the United States, from and to any other country, in vessels of the Netherlands, shall pay no higher or other duties than shall be levied on the like goods and merchandise imported or exported in national vessels. Reciprocally, goods and merchandise, whatever their origin may be, imported into or exported from the ports of the Netherlands, from and to any other country in vessels of the

United States shall pay no higher or other duties than shall be levied on the like goods and merchandise imported or exported in national vessels.

The bounties, drawbacks, and other privileges of this nature which may be granted in the States of either of the contracting parties on goods imported or exported in national vessels shall also and in like manner be granted on goods imported or exported in vessels of the other country.

The appeals present for decision the question (1) whether J, subsection 7, upon enactment of the tariff act of 1913, became operative *in præsenti* or *in futuro;* and (2) if the former, are the treaty articles either self-executing or executed by subsection 7, thereby extending the 5 per cent discount to all such treaty nations?

The conclusion is of unusual importance both as to the magnitude of the interests, affecting the immediate parties, and the international rights involved. The issues should, therefore, be resolved as illuminated by all applicable sources of enlightenment.

The object here sought to be accomplished by Congress, as distinguished from the intent manifested by the enactment employed to that end, is written in the judicial and legislative history of the subject matter—the American merchant marine.

The long-established practice of the courts in the determination of the relative effects of statutes and treaties, and the congressional intent in such statutes, is to trace the history and policy of the Government upon the subject matter as witnessed by the treaties concluded, statutes made, and the administrative and executive policies adopted. Oldfield v. Marriott (10 How., 51 U. S., 146); Downs v. United States (187 U. S., 496); Aldridge v. Williams (3 How., 44 U. S., 8, 23); United States v. Trans-Missouri Freight Association (166 U. S., 290, 318); Tilge v. United States (2 Ct. Cust. Appls., 129, 131; T. D. 31662); United States v. American Express Co. (2 Ct. Cust. Appls., 95; T. D. 31636); United States v. Whitridge (197 U. S., 135); United States v. Union Pacific Railroad Co. (91 U. S., 72, 79).

The condition sought to be remedied was the conspicuous insignificance of the American merchant marine when compared with that of the other greater nations. Historically ours had been in the earlier days of the nation, and even in the colonial days, proportionally many times greater.

In so far as this decadence may have been effected by legislation, it was before the Congress at this enactment that from the period of 1789 to 1815 laws effecting almost complete discrimination were of our statutes; from 1815 to 1828, partial discrimination with partial treaty reciprocity obtained; and from 1828 to 1909, practically complete treaty reciprocity. Be it noted that the policy of discrimination was maintained by positive statute and the gradual transition to the policy of reciprocity was by all the mediative acts, that of March 3, 1815 (3 U. S. Stat., 224), of January 7, 1824 (4 U. S. Stat., 2), and of May 24, 1828 (4 U. S. Stat., 308), legislatively rested con-

ditionally upon the finding of conditions and proclamation thereof by the President. All these acts were in fact and in practice conditional and became effective only upon diplomacy first effecting by treaty the proclaimed condition precedent. In other words, sometimes with and sometimes without the statute naming the condition, the transition from the period of discrimination to that of reciprocity was, in fact and practice, made conditional upon diplomatic agreement. Concurrently with this change and continuance of policy occurred the commencement and continuance of the decadence of the American merchant marine.

This decline Congress knew gradually continued to date, and so continues. The debates disclose that the first act passed by the American Congress July 4, 1789, section 5, allowed a discount of 10 per cent of all duties imported in American-built vessels. In 1795, 92 per cent of our imports and 88 per cent of our exports were so carried; in 1826, 95 per cent of our imports and 89.6 per cent of our exports; in 1830, 93.6 per cent of our imports and 86.3 per cent of our exports; in 1845, 87.3 per cent of our imports and 75.3 per cent of our exports; in 1860, 63 per cent of our imports and 69.7 per cent of our exports; in 1870 American ships carried 35.6 per cent of our foreign trade, which has gradually declined to 9.4 per cent in 1912 and 8.7 per cent in 1913.

In this political and legislative status paragraph J, subsection 7, was passed by the House of Representatives without the proviso, subsequently added in conference, as follows:

J. Subsection 7. That a discount of 5 per cent on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States: * * *

If these words permitted any doubt as to their purpose, the report of the Ways and Means Committee thereupon submitted to the House tolerated no such uncertainty. It read:

Subsection VII of paragraph J is new legislation providing that a discount of 5 per cent of all duties imposed at the customhouse shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States. It is *a discrimination in favor of American shipping,* similar to the provisions of some of the first tariff bills that were enacted by the Congress of the United States. Under like legislation the merchant marine of the United States was encouraged and developed in the early decades of the last century until our merchant marine became the largest carrier of merchandise in the world. We believe that *to again discriminate* in favor of American shipping will build up *our merchant fleet* and keep at home millions of dollars that are now being paid to foreign vessels to carry the products of our country to foreign markets. (Report, to accompany H. R. 3321, of Committee on Ways and Means, 63d Cong., first session. Rept. No. 5, p. LII.)

It would seem to be important and subsequently instructive to inquire what would have been the precise effect upon existing pertinent treaties had this bill become a law. Upon this point Mr. James R. Mann, minority House leader (Cong. Rec., 63d Cong., 1st sess., vol. 50, pt. 1, p. 744), categorically catechised Mr. Oscar Underwood, chairman of the reporting committee, and House majority leader, to answer:

There is nothing in the bill there with reference to the treaties * * *. Does the discount apply only to goods brought in American bottoms?

And, after many days for consideration (Cong. Rec., 63d Cong., 1st sess., vol. 50, pt. 2, p. 1358), Mr. Underwood replied:

Now, there are gentlemen who contend that if subsection 7 were enacted law it would mean, instead of discriminating in favor of American shipping, that we will reduce the duties on all imported goods coming into this country by foreign vessels by reason of treaty rights. I never have believed in that contention. I do not think it is a fair construction of the law; but I have in my office here letters transmitted to me by the State Department from three of the leading maritime nations of the world protesting against this section because they say it is a discrimination against their vessels. Now, if the contention that is being made by gentlemen on that side of the House is correct, that goods coming from Germany, or France, or England, would be admitted 5 per cent cheaper than they would if this section was removed, I can not see why the ambassadors from three great maritime nations should protest against this paragraph. It may be that the chancellors, supposed to be learned in the law of nations, supposed to be here to guard their own countries, are mistaken as to the effect of this paragraph, and that the gentlemen on that side of the House are better lawyers as to the effect on their commerce and their ships than are the chancellors, but I am inclined to think that with the weight of their protests leaning in favor of the construction that I placed on this paragraph in the opening of this debate, it is safe to say that in the end this construction will be maintained.

Was Mr. Underwood in error? If these relevant treaty articles are executory he was right. If the pertinent treaty articles are self-executing and were not repealed thereby, he was wrong.

If these articles are executory, the proposed enactment *contravened* the treaty *promise* of this country; if they are self-executing and would not have been repealed or would have been executed by the proposed enactment, the treaty conventions would have been neither abrogated nor impaired thereby, but would have become, perforce the treaty in the first and the statute in the latter case, a part of the *municipal* law of the land cognizable as such by the courts. In that view, unless they were executory only, there was no reason for complaint by the combined learning of the chancellors of the leading nations of the world, as the proposed statute, in this view, would in no wise have contravened the treaties.

The legal status seems to have been, however, that if the treaty articles were self-executing they would not survive such an enactment, but being a municipal law would have been repealed thereby,

and thus the treaty articles would have been contravened. In no event would the proposed law inure to the benefit of the treaty nations save in the view that it would have executed executory treaty articles, which obviously was not the view of Mr. Underwood or anyone concerned. J. Ribas y Hijo v. United States (194 U. S., 315); Chae Chan Ping v. United States (130 U. S., 581); Whitney v. Robertson (124 U. S., 190).

Since the controversy here concerns the effect of the proviso added by the Senate, it will be instructive to first inquire the scope and effect in the disputed particulars of the House language.

What would have been the status and rights of the treaty nations had the House provision without the proviso become the law? That question must be answered by a reference solely to the treaty articles. Are they self-executing or are these treaty articles executory— promissory?

The board held these treaty articles executory and not self-executing. The majority opinion of this court holds the contrary. I am not clear whether the majority opinion relies upon the status that the treaty articles are self-executing or have been executed by J, subsection 7. In either view I am of the opinion that the board did not err in this particular.

Mr. Justice Day, in his monograph upon treaties (38 Cyc., 961– 982, at p. 972), has concisely stated the distinctions between self-executing and executory treaties. Under the title "Treaties"— "Self-Executing Provisions" it is stated:

A treaty is to be regarded in courts of justice as equivalent to an act of Congress whenever it operates of itself *without the aid of any legislative provision.*

An executory treaty is defined by him as:

When the terms of the stipulation *import a contract*, or when either of the parties *engages to perform* a particular act, the treaty addresses itself to the political and not the judicial department of the Government.

The difference *resides in the character of the treaty article itself* and not in the affecting legislation, age, or construction of the convention. Before a treaty becomes or is self-executing it must contain *as a part thereof* a complete codification or admeasurement of the penalty, reparation, or right due the subjects of the other high contracting power upon contravention of the particular article, so that the courts can *look alone to the treaty* and adjudge in terms measured solely thereby the right guaranteed or reparation due.

The Supreme Court has tersely remarked the distinction between those self-executing treaties which are municipal laws of the land *enforcible by the courts* and those not, in these words:

A treaty, then, is a law of the land *as an act of Congress is whenever* its provisions *prescribe a rule* by which *the rights of the private citizen or subject* may be determined. And when such rights are of a nature to be enforced in a

court of justice, that court *resorts to the treaty* for the rule of decision for the case before it *as it would a statute.* Head Money Cases (112 U. S., 580, 598, 599) ; Foster *v.* Neilson (2 Pet., 27 U.'S., 253, 314) ; Taylor *v.* Morton (23 Fed. Cas., Case No. 13799, p. 784) ; Bartram *v.* Robertson (122 U. S., 116) ; Whitney *v.* Robertson (124 U. S., 190) ; United States *v.* Forty-three Gallons of Whisky (93 U. S., 188, 196).

While the majority opinion relies upon these cases for the contrary construction of these treaty articles, rather than extend a'necessarily lengthy opinion for support of the position here taken, reference is had to a full review upon this point of the above cases and others in the dissenting opinion, American Express Co. *v.* United States (4 Ct. Cust. Appls., 164 to 174, inclusive; T. D. 33434).

A self-executing treaty article derives its character as such from the nature of the article *per se.* Such a treaty duly made needs no law to execute it, but is a codification *per se* of the subject matter prescribing the agreed rights and reparation.

Executory treaties, upon the other hand, being promissory only and usually being applicable to a variety and possibly different classes of acts and degrees thereof, which may violate or contravene them, can not possibly *per se* anticipate or admeasure in advance the appropriate or particular reparation which may become due upon every one of a variety of acts of contravention. And, therefore, that adjustment or its denial must necessarily be one of political wisdom *not measured by any law of the land,* and such treaties, therefore, are not addressed for enforcement to the courts, which enforce its *municipal laws* only, but to the political departments of the Government.

Many of the cases urged upon the court and adopted by the majority as precedents of self-executed treaty articles, are, in my view, not applicable. They are of a large class of cases relating to treaty articles which stipulate *personal rights of citizens and subjects* and are addressed to, stipulated of, and enforceable in our courts, the language of the treaty being a full and complete definition of the particular asserted and adjudged right, no resort being necessary to any statute or other law than the treaty language for the ascertainment of that right. These treaty articles are of a character that brings them exactly within the definition of self-executing treaty articles as rules of action. Perhaps the most concise definition and differentiation of these is found in Head Money cases (112 U. S., 580, 598), as follows:

A treaty is primarily a *compact between independent nations.* It depends for the enforcement of its provisions on the interest and the honor of the Governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. *It is obvious that with all this the judicial courts have nothing to do and can give no redress.* But *a treaty may also* contain provisions which confer certain

rights *upon the citizens or subjects* of one of the nations residing in the territorial limits of the other, *which partake of the nature of municipal law,* and which are *capable of enforcement as between private parties in the courts* of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance when the individuals concerned are aliens. The Constitution of the United States places such provisions as these in the same category as other laws of Congress by its declaration that "this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." *A treaty, then, is a law of the land, as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.* And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a *rule of decision* for the case before it, as it would to a statute.

A very early exposition of this class of cases is had in Ware *v.* Hylton (3 Dallas, 3 U. S., 199, 242, *et seq.*). Article IV of the treaty with Great Britain, 1783, was in these words:

It is agreed that creditors on either side shall meet with no *lawful impediment* to the recovery of the full value in sterling money of all bona fide debts heretofore contracted.

Chief Justice Chase said:

A *lawful impediment* to prevent a recovery of a debt can only be *matter of law*, pleaded in bar to the action. If the word lawful had been omitted, the impediment would not be confined to matter of law. * * * I consider the fourth article in this light, that it *is not a stipulation that certain acts shall be done*, and that it was necessary for the legislatures of individual States to do those acts; but that it is an express agreement that certain things shall not be permitted the American courts of justice, and that it is a contract on behalf of those courts, *that they will not allow such acts to be pleaded in bar*, to prevent a recovery of certain British debts. * * * No one can doubt *that a treaty may stipulate that certain acts shall be done by the legislature, that other acts shall be done by the executive, and others by the judiciary.*

In other words, this treaty article stipulated a *rule of action* for the courts, and was in itself the complete legal expression upon the subject, declaring as a rule of law for the courts that a certain plea in bar must be sustained.

The Supreme Court in United States *v.* Rauscher (119 U. S., 407, 418) quoted the rule as laid down in Head Money cases with the approving words:

This whole subject is fully considered in the Head Money cases (112 U. S., 580), in which the effect of a treaty as a *part of the law of the land*, as distinguished from its aspect as *a mere contract between independent nations*, is expressed in the following language—

Citing also Chew Heong *v.* United States (112 U. S., 536, 540, 565). Again invoking the same principle in the Chinese Exclusion case (130 U. S., 581, 609), the court said:

Thus in the Head Money cases the court speaks of certain rights being in some instances conferred *upon the citizens or subjects* of one nation residing in

the territorial limits of the other, which are *"capable of enforcement as between private parties in the courts of the country."* "An illustration of this character," it adds, "is found in treaties which regulate the *mutual rights of citizens and subjects* of the contracting nations *in regard to rights of property by descent or inheritance* when the individuals concerned are aliens."

See also *In re Cooper* (143 U. S., 472, 500) ; Geofroy *v.* Riggs (133 U. S., 258, 267) ; Hauenstein *v.* Lynham (100 U. S., 483, 486–488).

There is, however, an obviously broad distinction between this class of cases stipulating a rule of law addressed the courts for the benefit and avail of the citizen or subject and a broad national promise to legislate or not legislate in a discriminatory way.

In the very nature of the case, a guaranty that our courts will or will not do a certain thing, usually if not always concerning property or personal rights of the *citizen or subject,* addressed to or stipulated on behalf of our courts, which alone adjudicate and enforce such rights, is vastly different from a promise that the *nation* which acts alone through Congress or its political agencies will or will not do certain things. The one, when stipulated, becomes a rule of action or law for the courts; the other a promise on behalf of the country, to be accordingly observed, ignored, or parleyed.

The expression by Chief Justice Chase, in Ware *v.* Hylton (3 Dallas, 3 U. S., 199, 242), is replete with pertinent thought:

No one can doubt that a treaty may stipulate that certain acts shall be done *by the legislature,* that other acts shall be done *by the executive,* and others *by the judiciary.*

*Ex necessitate,* a general treaty stipulation, like the familiar favored-nation clauses, covering an indefinite variety of acts, embraces, according to subject matter, all such. When invoked, compliance rests, according to the subject matter, with the particular governmental department—executive, legislative, or judicial—having cognizance thereof as so invoked. If a matter of import duties as this, of course, "Congress," being the sole constitutional source of such, is the only reparatory source. If the less important subject matter is one of mere executive jurisdiction and performance, such as is presented by the letter of the Attorney General, January 12, 1915, referred to in the majority opinion, the appropriate department, with or without advice of the Attorney General, acts.

Unquestionably a treaty which otherwise might be executory in character may, by express reference to an existing status, as in United States *v.* Percheman (7 Pet., 32 U. S., 51), or by express reference to existing or future legislative enactments, as in United States *v.* Forty-three Gallons of Whisky (93 U. S., 188, 191–196), so complete its terms by thus adopting as a part of the treaty which makes it a complete codification of rights on the particular subject matter as to be self-executing, but such is not the present case.

This legal status differs in no essential particular from those treaties wherein these rights are fully defined and made a rule of law for the courts in the treaty article itself, as in Hauenstein *v.* Lynham (100 U. S., 483, 486), and the *Peggy* (1 Cranch, 5 U. S., 102). See also Tucker *v.* Alexandroff (183 U. S., 424, 436) ; Charlton *v.* Kelly (229 U. S., 447).

There is nothing in Olsen *v.* Smith (195 U. S., 332) to the contrary. The fact that the court therein adopted another ground of decision does not argue the treaty article other than executory. To have decided that point also would have been a work of supererogation.

An executory treaty can, of course, be executed by legislation. The *treaty*, however, in such cases does not become the *municipal law* of the land enforcible by the courts, but the statute executing the treaty is such. The treaty remains executory, awaiting other applications, the statute being the admeasured compliance with its promise thus fulfilled as to the particular subject matter of the statute by the legislative department of the Government. The executing statute is the law and the whole law for the courts to construe and enforce. The courts have nothing to do with the treaty promise save that in cases of doubtful intent in the statute they can look to the treaty promise as an instructive guide. Chew Heong *v.* United States (112 U. S., 536–549).

Conceding and reaffirming all said in the majority opinion as to long recognition, approval, and action under these treaties, neither their age nor previous application nor recognition nor ratifying legislation executes an executory treaty. To hold otherwise rejects the obvious distinction between *ratification* and *execution* of a treaty; and in most of the enumerated instances clothes the executive departments of the Government with legislative powers—it being the exclusive province of Congress to execute executory treaties. Executory treaties can be executed solely by Congress legislating not mere approval of the treaty promise—ratification—but admeasuring the stipulated performance or reparation as to the particular subject matter, which statute and that alone becomes the municipal law of the land cognizable by the courts.

Of course, *every* treaty and treaty article is by the Constitution declared to be and is *of* the supreme laws of the land, but it does not follow that being such the *courts* must *enforce* all our laws, whether or not treaties, or that a treaty ceases to be a law when not enforcible by the courts. Indeed, the great majority of our laws are enforced by other tribunals than the courts and remain laws. From the very nature of treaties, being international *promises*, neither their construction nor enforcement naturally falls to the courts of either of

the high contracting parties. As was said by the Supreme Court in Head Money Cases (112 U. S., 580–598):

A treaty is *primarily* a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the Governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. *It is obvious that with all this the judicial courts have nothing to do and can give no redress.*

In fact, judicial construction and enforcement of treaty articles is comparatively exceptional, that office and duty being usually confined to other departments of the Government.

So that courts need entertain no fear nor assume any unwarranted jurisdiction upon the assumption that our treaty promises will otherwise go unheeded and our national honor be lost. The coordinate branches of the Government can quite as well be relied upon to do their duty, as they can not be assumed less vigilant, and certainly are much better qualified to enforce or parley infraterritorial demands.

Undoubtedly it is within the jurisdiction of the appropriate courts to take cognizance of and interpret all treaties and all treaty articles when a proper case is made, whether they be executory or self-executing. But having once determined a particular treaty article to be executory in character and so declared, the court is without further jurisdiction to proceed *to enforce* the same or admeasure remedies thereunder, but must for that reason deny the relief sought. That was exactly the course pursued by Mr. Justice Curtis in Taylor *v.* Morton, *supra*, in passing upon a precisely similar article to those of the Russian treaty of 1832, and is the logical result of such a legal situation. Having examined the treaty articles and found them executory—promissory—a law, but not one cognizable by the courts, as said by Mr. Justice Curtis, "until such act shall be passed, the court is not at liberty to disregard *the existing laws* on the subject." See also Terlinden *v.* Ames (184 U. S., 270).

Aside from any reasoning upon the subject as to the executory or self-executing character of these treaty articles it may be deemed quite sufficient to justify the position taken, that the Supreme Court has many times approved a decision holding executory a precisely similar provision of the Russian treaty of December 18, 1832, Article VI (8 Stat., 444), which reads:

No higher or other duties shall be imposed on the importation into the United States of any article the produce or manufacture of Russia; and no higher or other duties shall be imposed on the importation into the Empire of Russia of any article the produce or manufacture of the United States, than are, or shall be, payable on the like article being the produce or manufacture of any other foreign country.

That was the treaty article the subject of Taylor *v.* Morton (Fed. Cas., 23, case No. 13799, p. 784), Taylor *v.* Morton (67 U. S., 481), opinion by Mr. Justice Curtis, of the Supreme Court, sitting in circuit, an opinion repeatedly and uniformly referred to by the Supreme Court in every similar case for the last half century as the leading case upon executory and self-executing treaty articles. Of this convention Mr. Justice Curtis said:

The truth is that this clause in the treaty is *merely a contract, addressing itself to the legislative power.* The distinction between such treaties and those which operate as laws in courts of justice is settled in our jurisprudence.

Advertence to the several treaty articles here invoked discloses that all and every one is promissory in terms and that no one of them by its own terms admeasures the relief here sought, to wit, *5 per cent* or other fixed definite reduction of duties upon certain imports. On the contrary, the quantum of relief sought, *5 per cent reduction*, is written in the statute and not the treaty. Nor is the stipulation one affecting the rights of the citizen or subject, but is a compact between nations.

But it is said that upon enactment of the statute the terms of the treaty immediately attach and at once apply in favor of the parties to the treaty; that if the treaty be a law of the land that the treaty and the act are laws *in pari materia*, and must be so considered.

Without yielding the position that in executed treaties the executing statute is the law and whole law for the courts, looking to the treaty only as a guide in construction *and not as a part of the law*, *in pari materia*, let us here assume that the treaty article does not become such and consider before us all of the thus assumed law *in pari materia*, including the treaty article.

The importation was, let us say, of linen collars and cuffs, assessed under paragraph 277 of the act of 1913 at 30 per cent ad valorem, imported in a vessel concededly not admitted to registration under the laws of the United States, but a vessel of a treaty country. The law *in pari materia* is:

1. The first provision of the act, *supra*, declaring: " * * * there *shall* be levied, collected, and paid upon *all* articles when imported from *any foreign country* into the United States * * * *the rates of duty which are by the schedules and paragraphs of the dutiable list of this section prescribed, namely:* "

2. Schedule J, paragraph 277, provides:

" Shirt collars and cuffs, composed in whole or in part of linen, 30 per centum ad valorem."

3. J, subsection 7, provides: " That a discount of 5 per centum on all duties imposed by this act shall be allowed on such goods, wares, and merchandise as shall be *imported in vessels admitted to registration under the laws of the United States: Provided,* That nothing in this subsection shall be so construed

as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation."

4. The treaty stipulations provide: 'That no higher or other duty shall be imposed upon goods imported into the United States in the vessels of the other contracting nation than are charged when imported in vessels of the United States and reciprocally.'

Whether we read the applicable conspectus of law which the courts may apply as confined to the statutes of Congress, looking only to the treaty, if necessary, as a guide to interpretation or as including the treaty articles as a part of the law *in pari materia* the result will be the same.

Subsection 7, it will be noted, *in express limited terms* carves out an exception to the foregoing paragraphs, thus limiting the reduced duty to goods imported in " vessels admitted to registration under the laws of the United States." That is the express limitation and scope of the words of the law before the court to be enforced—the only statutory exception to the preceding provisions of the tariff act. The *courts* must and can only enforce the law as written upon the statute rolls. We must enforce the law and the whole thereof as we find it written. Obviously to grant the relief herein prayed for the court must disregard the comprehensive language of the first clause and paragraph 277 of the act, levying 30 per cent duty upon such articles when imported from " any foreign country," or it must amend subsection 7 by striking out its express limitation to " vessels admitted to registration under the laws of the United States." If we look to the whole of the relevant acts of Congress we find an express levy of 30 per cent ad valorem upon these importations when imported from *any foreign country*, and a discount of 5 per cent *limited by the words of the statute* to those goods only imported *in vesels of American registry*. The simple issue is, Shall the courts strike out this limiting language of the statute, or amend by inserting the equivalent of " and also in the vessels of treaty nations," as Congress did in the acts of July 30, 1846, August 5, 1861, and in J, subsection 1, this act, quoted, *infra;* or, is not this a case for and shall not the courts await the action of Congress, which alone under the Constitution can amend its statutes? In the precise situation Mr. Justice Curtis said: " Until such act be passed, the court is not at liberty to disregard the existing law on the subject."

If we hold that the treaty articles are self-executing or are executed by the statute, or for any reason shall be read *in pari materia* with all the provisions of the act, as is done by the majority, incontrovertibly, there is a conflict in this code of applicable law in that the treaty law gives this reduction to goods imported in the vessels of all, or rather to each, of the treaty nations, while the statute de-

nies it to any one of these, and *in its express words limits* the discount
to those goods only imported in vessels of American registry. The
conflict is obvious. How shall the courts resolve this conflict? What
canon of construction here controls the courts? That rule is well
known and long established. Concededly these treaties were con-
cluded prior to the enactment of the statute. The accepted rule is:

> While there is no provision in the Constitution as to the effect of conflict be-
> tween treaties and acts of Congress, they are placed by that instrument upon
> the same footing, each being declared to be the supreme law of the land, so
> that neither having inherent superiority over the other, either may supersede
> the other, and in case of conflict the one which is later in date will control.
> (38 Cyc., 975; Ribas *v.* United States, 194 U. S., 315; Chae Chan Ping *v.* United
> States, 130 U. S., 581; Whitney *v.* Robertson, 124 U. S., 190; Ropes *v.* Clinch, &
> Blatch., 304; Fed. Cas., vol. 20, 1171, No. 12041, referred to with approval in
> and see Head Money Cases, 112 U. S., 580-598.)

The legal status and duty of the courts in such a condition of law
is well settled. A treaty being but a contract between nations, the
rules controlling the construction of treaties are in no wise occult or
different from those applicable to contracts between individuals.
Tucker *v.* Alexandroff (183 U. S., 424-437).

Being a contract, enactment of a contravening statute does not
abrogate the treaty. Treaties may be violated and not abrogated in
the sense that they are denounced or terminated but continue to exist
as international contracts. As said by Mr. Justice Day (38 Cyc.,
980):

> The violation of a treaty by one party does not of itself terminate or render
> void the treaty but makes it voidable at the option of the other party, who may
> waive or remit the infraction or demand satisfaction therefor. Terlinden *v.*
> Ames (184 U. S., 270).

The statutory language confining the discount to American ves-
sels undoubtedly conflicts with the treaty language promising not to
so legislate. The duties of courts confronted with such a legislative
status are clearly defined by the Supreme Court in Botiller *v.*
Dominguez (130 U. S., 238-247), stating:

> With regard to the first of these propositions it may be said that so far as
> the act of Congress is in conflict with the treaty with Mexico, that is a matter
> in which *the court is bound to follow the statutory enactments of its own
> Government.* If the treaty was violated by this general statute enacted for
> the purpose of ascertaining the validity of claims derived from the Mexican
> Government, it was a matter of international concern *which the two States
> must determine by treaty or by such other means as enables one State to
> enforce upon another the obligations of a treaty.* This court, in a class of cases
> like the present, has no power to set itself up as the instrumentality for en-
> forcing the provisions of a treaty with a foreign nation which the Government
> of the United States, as a sovereign power, chooses to disregard. The Cherokee
> Tobacco (11 Wall., 616); Taylor *v.* Morton (2 Curtis, 454); Head Money cases
> (112 U. S., 580-598); Whitney *v.* Robertson (124 U. S., 190-195).

Again, the Supreme Court in Thomas *v.* Gay (169 U. S., 264–271) reiterated the doctrine in the words:

It is well settled that an act of Congress may supersede a prior treaty, and that *any questions that may arise are beyond the sphere of judicial cognizance,* and must be met by the political department of the Government.

In such emergencies the courts confine their jurisdiction and decrees to the words of the statute—here limited to American ships—and the treaty rights are left for determination and adjustment by the political powers of the Government.

It is inconceivable how, when the courts are bound to give effect to all the statutes and parts thereof and the statute expressly grants this bounty to "American" ships only, they can decree it also to foreign ships—and this whether the treaty be executory, self-executing, or executed.

That this position does not ignore the proviso to J, subsection 7, which is simply and only a limiting rule of the construction to be given purview of the paragraph, adding nothing to but limiting its substantive force, will be a matter of later consideration.

The Senate, after taking advices from the Department of State and full debate, struck the House provision from the act. The debates indicate various motives therefor impelling different Senators. While some, like Senator John Sharp Williams, took the position that the decadence of our merchant marine was due to such natural causes as the discovery of the uses of iron and steel in shipbuilding and our Civil War, and others, like Senator Gallinger and Senator Jones of Washington, attributed the decline to our early laws, treaties, and more or less questionable subventions and bounties given in the face of these treaty stipulations by foreign powers; nevertheless, these early acts of Congress permitting, and the reciprocity treaties made thereunder before recited, were generally held by Senators, to a great extent at least, responsible therefor. A uniform desire appeared to restore our prestige upon the sea, and an equally uniform expression was made that in order to return thereto these reciprocity treaties must first be eliminated. In no part of this debate, however, and in no line of any advices submitted to the Senate can it fairly be said that should the House provision become a law it was self-executing and would at once accrue to the benefit of the treaty nations. On the contrary, running through the entire proceedings is the implied assumption that that provision so contravened these treaties that retaliation and like discrimination would follow or reparation be sought, not through our courts but through diplomatic polemics. The probability of retaliation and discrimination which would nullify all advantage of the House provision seemed so strong with Senators that it, probably more than any other cause, led to the defeat of the House provision.

The attitude of the Senate, measured by a full review of the debates, seems accurately reflected by the report of the Finance Committee upon the subject, which was upheld by vote of the Senate. It States:

Your committee struck out subsection 7 of paragraph J, page 263, giving a discount of 5 per cent on all duties upon goods imported in American bottoms. The provision was in contravention of some 19 or 20 treaties of the United States, without having been preceded by the courtesy of a notice of revocation, and was very properly protested against by the high contracting parties with whom we had treaties. In our opinion it would have led to no good result, as every other country could have retaliated, and all the countries at the end would have been just about where they started. Moreover, the country which could use that principle with most force and effect in injuring other countries would be the country with the largest merchant marine, and the country which could least effectively use it would be the country with the smallest merchant marine. We were, therefore, not only inviting an endless retaliation but a retaliation where our opponents would have had in nearly every case the better of it, and in many cases infinitely the better. (Report Senate Finance Committee, Cong. Rec., vol. 50, pt. 3, p. 2515, 63d Cong., 1st sess.)

The contravention by the House provision of existing treaties moved the Senate to action respecting the provision. Its respect and consideration for these treaties led it also to reject all amendments enacting abrogation in any limited time. Obviously, then, the Senate attitude was that these treaties should be abrogated *by consent alone.*

But, in passing, what did the Senate attitude argue as to these treaty articles being executory or self-executing? If the Senate deemed the House provision executed these treaties, or that they were self-executing and were not thereby abrogated, why report that retaliation would follow? Is an act of Congress which the Senate reports so contravenes our treaties as would lead to retaliation in the view of the Senate an act executing a treaty? Would retaliation follow an enactment that executed a treaty thereby reducing duties on foreign imports 5 per cent and giving an advantage to all treaty nations of 5 per cent on our imported goods carried by their vessels? As between the high contracting powers in that view what *discrimination* was there? Nor did the letters of Secretary of the Treasury, Mr. McAdoo, nor Mr. John Bassett Moore (Cong. Rec., vol. 50, pt. 5, pp. 4237–4263), claim or imply that the House provision, if enacted, would immediately inure to the benefit of the treaty nations; that the treaty articles were self-executing or would be executed by that enactment. Contemplating retaliation, protest, and diplomatic parley, they must have explicitly assumed the contrary.

The idea seemed general and paramount with Senators that these treaties were an insuperable objection to the present enactment of the House provision and its subsequent immediate operation and effect as a statute.

In this mind of the respective Houses of Congress the House bill and Senate act, as stated, went to conference, was reported to the two Houses, adopted, and became a law, subsection 7 being adopted as the best solution of their respective ideas under existing conditions.

The fact that it is the House provision with a proviso relating to the treaties which the Senate deemed, and on vote held, an objection to present enactment of the House provision seems significant that the conferees combined therein the ideas of the two Houses; that is, to grant the discount *when* the treaties ceased to be an objection thereto.

Whatever view the Senate may have taken of the effect of the House provision upon the treaty articles, whether executory or self-executing and thereby contravened (certainly not executory and thereby executed), subsection 7 was intended to meet the dual purpose of the House to enact a discriminating duty in favor of our ships and meet the objections thereto by the Senate that the integrity and promise of the treaties should not be disturbed. That the purpose of the House is therein maintained is testified by the entire House provision being retained *in haec verba*. Did the Congress having thus decreed this effect, by the proviso execute these treaty articles thereby extending the discount to the vessels of all these treaty nations as well as ours; or, by postponing the operation of the House provisions until the treaty articles could be eliminated?

It is said in the opinion of the majority:

If these treaties require legislative action to give force and effect thereto, they have it in the proviso to the subsection as well as in the numerous preceding tariff acts.

That a proviso declaring that nothing in its contents or its purview constituting the subsection "shall be construed to abrogate or in any manner impair or affect" a treaty executes that treaty would in addition to the foregoing reasons seem to be refuted by the very words employed. Congress in similar situations impelled by motives to execute similar treaties has employed language of far different import, clear and unmistakable. In 1903 by act of December 17 (33 Stats., 3, c. 1), Congress executed the Cuban treaty, similar in import and classed with these treaty articles in the cases here presented, by enacting as a statute the precise terms and fixed rates of duty agreed by the treaty to be granted Cuba (33 Stats., 3, c. 1). Likewise, when by "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes," July 26, 1911, Congress executed the reciprocity agreement with Canada, it enacted the precise rates and all the terms prescribed by the treaty *as a Federal statute*. Why? Because when a treaty article is executed and becomes a rule of action or municipal law, cognizable and enforc-

ible by the courts, the courts look to the act alone and not the treaty for the law of the case, referring only to the treaty as a guide in doubtful construction.

Looking now to subsection 7, how does that compare with the executing statutes of the Cuban and Canadian treaties? Its grant is expressly confined to "vessels of *American registry*," and *the language of the statute* measures the powers of the court. How different those acts spreading upon the statutes cognizable by the courts, statutory admeasurement in words and figures of each treaty promise, and this claimed executing act providing that "nothing in the subsection shall be construed to *in any manner affect any treaty with any nation*." *It might recognize but probably not even ratify, not to say execute, a treaty article.*

Moreover, whenever Congress has desired to extend such bounties to treaty nations in conformity with treaty promises, it has used apt and no uncertain words to that end. The wording of prior and contemporaneous statutes *in pari materia* are always legitimate and valuable guidances in statutory interpretation. Reiche *v.* Smythe (113 Wall., 80 U. S., 162–165); United States *v.* St. Anthony Railroad Co. (192 U. S., 524).

Congress on previous occasions has legislated upon the subject of favoring American ships, then as now confronted with these treaty stipulations. It is significant that, on those occasions as well as in this very act, when Congress intended the treaty nations to equally enjoy this bounty it *in express terms so enacted.*

That such has been the particular caution upon part of Congress in all discriminating-duty acts from 1816 to date is admitted by the majority opinion, express reference being made to the tariff act of 1897. Other particular instances follow.

The tariff act of Congress passed on the 30th day of July, 1846, has the following section:

*Schedule 1.* (Exempt from duty.) * * * Coffee and tea, when imported direct from the place of their growth or production in American vessels *or in foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties*, tonnage, and other charges. * * *

So the act of August 5, 1861, section 3, provided:

SEC. 3. *And be it further enacted*, That all articles, goods, wares, and merchandise imported from beyond the Cape of Good Hope *in foreign vessels not entitled by reciprocal treaties to be exempt from discriminating duties*, tonnage, and other charges, and all other articles, goods, wares, and merchandise not imported direct from the place of their growth or production *or in foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties*, tonnage, and other charges shall be subject to pay, in addition to the duties imposed by this act, ten per centum ad valorem: *Provided*, That this rule shall not apply to goods, wares, and merchandise imported from beyond the Cape of Good Hope in American vessels.

In the act here under consideration—tariff act of 1913, section 4, J, subsection 1, levying a discriminating duty upon goods imported in vessels not of the United States—it is provided:

J. Subsection 1. That a discriminating duty of 10 per centum ad valorem in addition to the duties imposed by law shall be levied, collected, and paid on all goods, wares, or merchandise which shall be imported in vessels not of the United States or which, being the production or manufacture of any foreign country not contiguous to the United States, shall come into the United States from such contiguous country; *but this discriminating duty shall not apply to goods, wares, or merchandise which shall be imported in vessels not of the United States entitled at the time of such importation, by treaty or convention or act of Congress, to be entered in the ports of the United States* on payment of the same duties as shall then be payable on goods, wares, and merchandise imported in vessels of the United States, nor to such foreign products or manufactures as shall be imported from such contiguous countries in the usual course of strictly retail trade.

Here we have a legislative interpretation by Congress extending over a period of more than half a century, and exercised in the very act under review, that an enactment expressly extending and confining a bounty to or discrimination in favor of "American" vessels would not without express words extend to treaty-nation vessels. How different this from the language in J, subsection 7? In the one Congress by express, apt words extended the same privileges to treaty-nation vessels; in the other it not only failed to so do, but expressly enjoined the courts from construing any treaty as being "affected" by its enactment; in other words, the treaties were to stand and be effective exactly as before, when and as though there was no such enactment.

It may here be opportune to refer to the case of Oldfield v. Marriott (10 How., 51 U. S., 146), quoted at length by counsel for importers and greatly relied upon by both them and the majority of this court to sustain the position that these treaty articles are executed and put in motion by this enactment. From my limited point of view it shows exactly the contrary. It construed the provision of the act of June 30, 1846, *supra*, as affecting the treaty with Portugal. The court held it did not set in motion the treaty, because the treaty terms applied to ship tonnage and not duties on goods. All the language of the court as to the application of the treaty had it applied to duties on goods here quoted and cited, *must be read in connection with the statute, which expressly extended its exemption from duties not only to "American vessels" but to "foreign vessels entitled by reciprocal treaties to be exempt from discriminating duties."* The case is against the majority contention. If the treaty article was sufficient *per se*, as here held, to extend the exemption, why did Congress expressly extend it to treaty ships? Obviously because Congress then, as in all similar acts, deemed these words essential if treaty ships were to receive the exemption.

Let us examine the subsection thus enacted, permitting its words to speak as their own interpreter. The words of every statute are the primary guidance in its interpretation. The proviso reads:

*Provided*, That nothing in this subsection shall be so construed as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation.

It is not substantive. It neither levies a duty nor grants relief from such. *It is expressly a rule of construction addressed to and binding upon all courts and tribunals* called upon to apply the purview to which it is added, the House provision. It was neither intended to add to nor detract from the House provision, but to control its construction. To construe is to give effect to a statute, hence the proviso here is in words confined to the office of controlling the effect to be given the House provision. *Without the proviso it would be given immediate effect.* With and by it was other than the same effect contemplated? In terms it is confined to the purview and does not change or purport to change or control the construction to be given the treaties. Let us analyze this rule of construction.

In terms it is related only to "concluded" treaties. The treaty-making power is vested by the Constitution in the President and the Senate. After negotiation by the President or his agencies it is submitted for ratification by the Senate. Mr. Justice Day states (38 Cyc., 967): "After ratification by each of the contracting powers there must be an exchange of these ratifications, which constitutes the delivery and *conclusion* of the treaty, and up to this time the treaty is *inchoate* and may never take effect." Armstrong *v.* Bidwell (124 Fed., 690); *Ex parte* Ortiz (100 Fed., 955). He likewise states a treaty may be *"incomplete"* for want of approval by the House of Representatives in matters requiring their approval under the Constitution. (38 Cyc., 972.) Such treaties are often termed "unconstitutional," whereas they are in fact valid so far as completed, but incomplete as to the particular article. The question would not seem to arise here, for there is no question that these treaties have been duly "concluded," though possibly "incomplete," and that is the sole requirement of the proviso.

I am in perfect accord with the conclusion asserted in the majority opinion that—

. We are of the opinion that, considering the constitutional challenge alone, these treaties are clearly within the right of the treaty-making power to negotiate and ratify, and that when duly proclaimed in accordance with their terms they are, until denounced, or until they expire by their own limitation, or are by express or necessary implication repealed by act of Congress, operative and in force as the law of the land.

Of course all these *treaties* as a whole are, and ever since respectively concluded have been, regarded as binding upon the nation, and

many of their articles have been invoked and observed by other branches of the Government. But in no case has any *court* held the particular articles here in question of these treaties complete for the purpose herein claimed without express legislative action unqualifiedly and literally extending the claimed favor to the treaty nations. Undoubtedly, in their making, the treaty-making power was within its constitutional rights, and as the treaty articles invoked to-day stand, they are not unconstitutional, but the converse; but, until approved by both Houses of Congress, they can not be made the basis of such a claim *in the courts*. As suggested by the Supreme Court in De Lima *v*. Bidwell (182 U. S., 1, 198), the treaty article probably obligated *Congress* to enact in accordance with the treaty promise, and that is precisely the situation here. The treaty article *is valid, binding, and constitutional*, but it is a promise that Congress under the Constitution must consider and fulfill in the particular case according to its measure of justice; and until Congress so acts the treaty article is an *incomplete* law *in so far as the courts are concerned*. Until acted upon in a case like this it is addressed to Congress alone. The acts of Congress herein concern the duty—import laws. *Their extent is under the Constitution literally and legally defined entirely by the words of the acts of Congress. Under the Constitution neither the treaty-making power nor any court but Congress alone is constitutionally empowered to change, enlarge, or modify the words of Congress as written in such statutes.*

Upon this and the point that the treaty-making power can not usurp the functions of Congress and, by a treaty law, provide that which the Constitution has confided to Congress alone to enact, the decision of Mr. Justice McLean, sitting in circuit, in Turner *v*. American Baptist Missionary Society (5 McLean, 344; Fed. Cas., 344, No. 14251) seems convincing:

A treaty under the Federal Constitution is declared to be the supreme law of the land. This unquestionably applied to all treaties where the treaty-making power, without the aid of Congress, can carry it into effect. It is not, however, and can not be the supreme law of the land where the concurrence of Congress is necessary to give it effect. Until this power is exercised, as where the appropriation of money is required, the treaty is not perfect. It is not operative, in the sense of the Constitution, as money can not be appropriated by the treaty-making power. This results from the limitations of our Government. The action of no department of the Government can be regarded as a law until it shall have all the sanctions required by the Constitution to make it such. As well might it be contended that an ordinary act of Congress without the signature of the President was a law as that a treaty which engages to pay a sum of money is in itself a law. And in such case the representatives of the people and the States exercise their own judgments in granting or withholding the money. They act upon their own responsibility and not upon the responsibility of the treaty-making power. It can not bind or control the legislative action in this respect, and every foreign Government may be presumed to know

that so far as the treaty stipulates to pay money the legislative sanction is required.

The treaty articles are international promises which, until "Congress" acts, admeasuring and enacting compliance, remain such, and are not within the jurisdiction of our courts and thereby therein available to the citizen or subject.

So that if we adopt the doctrine of the majority of necessarily reading the treaty and statute law together, we have no efficacious treaty law, for it has not *as yet* been constitutionally enacted as a complete law for the invoked purposes. It may be obligatory upon Congress or the Executive; but, for the courts, not within their cognizance until duly enacted in accordance with the constitutional requirements as to the enactment of *all* import revenue laws. For the purpose of this class of cases, therefore, these treaty articles are not *unconstitutional* but *incomplete* under the Constitution as a municipal law of the land enforcible in the courts. They are for the political departments of the Government.

To continue the diversion to the conclusion of the immediate subject matter it may be said that while the Supreme Court has not expressly passed upon this controversy between the House and Senate it has nevertheless held the power to fix import duties so sacredly vested by the Constitution in "Congress" that it upheld the reciprocity treaties of recent years *solely on the grounds that Congress had previously fixed the exact alternative or conditional rates of duty*, leaving to the treaty-making and executing powers the determination only of the time when or condition upon which *one or the other of the schedules of or rates fixed by Congress* should be operative. That Congress could not otherwise even delegate this constitutional duty even to the treaty-making power. Field *v.* Clark (143 U. S., 649, 692, et seq.). Of course, Congress may refer to a treaty or treaties or articles thereof, and the latter alike may make reference to a statute as a part of the enactment or treaty, respectively, thereby making the respective laws (treaty or statute) a part of the same. But assuredly that was not this language, as is shown when we proceed to consider the same.

Other words of limitation of the proviso are that the subsection shall not be so construed as to "abrogate" or in any manner "impair" or "affect" the provisions of the treaties. It is a fundamental rule of construction that every word of a statute must be given some effect. The rule is so elementary that citation seems surplusage. The meaning of and distinction between "abrogate" and "impair," as applied to treaties, is patent and unimportant. The rule stated requires that a different meaning or effect be given the word "affect." Lexicographically the definitions are singularly uniform, as follows: Webster's New International Dictionary: "Affect. * * * To lay

hold on; to act upon; to produce an effect upon; * * *." Standard Dictionary, Twentieth Century Edition: "Affect. To have an effect upon; act upon; lay hold of; * * *." Worcester's Dictionary: "Affect. To act upon; * * *." The Century Dictionary and Cyclopedia: "Affect. * * * To act upon; * * *." Judicially these definitions and their common import have naturally been followed, save in cases where the context constrained a more limited meaning. Thus there are a class of cases where, being so constrained by the context and obvious intent as used, "affect" has been confined to the more limited meaning to "injuriously" or "adversely" affect. *In re* Davis' Estate (32 Oklahoma, 209); Nelson Bennet Co. *v.* Twin Falls Land & Water Co. (13 Idaho, 767); Baird *v.* St. Louis Hospital Association (116 Mo., 419). Where, however, not so constrained by the context, the word has uniformly been given its broad natural meaning. Thus in Sacramento Terminal Co. *v.* McDougall (19 Cal., 562) it was held that the word "affect" meant "to produce an effect upon," to "act upon." In Lyons *v.* Elston (211 Mass., 478) it was held that the word "affected" signified "acted upon, moved or changed." The Iowa Supreme Court has held "to 'affect' does not mean to impair, but to work a change upon." "A right is affected if it is either enlarged or abridged." Holland *v.* Dickerson (41 Iowa, 367); Clark *v.* Riddle (101 Iowa, 270). The doctrine seems to be accurately stated by the Missouri Court of Appeals, stating: "Undoubtedly a party may be beneficially affected, as well as injuriously affected, by anything, and the word '*affect*' standing alone, may be said to be equivocal." Tyler *v.* Wells (2 Mo. Appls. Repts., 526). See also to the same effect Home Building & Loan Association *v.* Nolan (21 Mont., 205); Canniff *v.* City of New York (4 E. D. Smith, 430–9); Westbury *v.* Simmons (35 S. E., 764). So the United States Circuit Court of Appeals for the Fourth Circuit states: "'Shall not affect' means shall not diminish or enlarge." The same doctrine was announced by the Supreme Court. The controversy grew out of the titles settled by Federal grant to the occupants of the territory ceded by France to this country in 1803, which act provided that "nothing herein contained shall be construed to *affect* the rights of any person claiming such lands," etc., confirmed by a designated commission. The court said:

How "affect" them? If in the sense of simply acting upon them, then his title is excepted from the operation of the act. But this exception is *not within the reason of the proviso,* and the court is at liberty to adopt another construction, if it may be fairly done, by giving full and just effect to the words used. * * * It is unnecessary to give the various definitions of the word "affect." It is enough to say that it is often used in the sense of acting injuriously upon persons and things, and in this sense we are all of the opinion it was used in this proviso. This interpretation accords with the reason and manifest intent of the proviso. Ryan *et al. v.* Carter *et al.* (93 U. S., 78).

The indisputable deduction from this peculiarly consistent line of adjudications is that the word "affect" when used in a statute is to be given its natural significance unless the plain intent of the statute indicates a more limited use. If we are to give heed to that cardinal principle of construction, that where possible every phrase and word of a statute must be given some effect not had by the others, there is no escape from the construction that since the entire and every degree of injurious and adverse effect upon a treaty is covered by "abrogate" and "in any manner impair," in order to give any effect whatever to the word "affect," not embraced by the others, such can only be done by assigning its use to the field of advantageous as well as injurious and adverse effects.

In this case, however, the court is not at liberty to select of these definitions, for the plain intent of the Congress as to its employment of the word is expressly written in the statute. It states "that nothing in this subsection shall be so construed as to * * * *in any manner* * * * *affect* the provisions of any treaty * * *." In the presence of this unmistakable postulate *written in a rule of construction* expressly addressed by the Congress to all courts before whom this statute may duly come for interpretation, it is not difficult to understand the intent of the Congress to have here used the word "affect," and we have no discretion but must apply the word in its broad, natural sense often approved by the courts, "to act upon"; "to produce an effect upon"; "to work a change upon"; "to enlarge or diminish." We are, therefore, upon proceeding to construe subdivision 7, confronted by the congressional condition that no construction shall be put thereupon which will hold said proviso as "acting upon," or "producing any effect upon," or "working any change upon," or "enlarging or diminishing" said treaty provisions.

*I am unable to concur when the court, conceding that a word is frequently legally applied in different senses, proceeding under an express statutory rule of construction to give it effect "in any manner" applicable, can select one meaning and reject other admitted senses of the word. It is to my mind proceeding in direct disregard of and in conflict with the very words of the act.*

Some latitude of application must, of course, be given that fundamental rule of statutory interpretation, which most of all such rules acquits of tautology and pays tribute to the literary precision of the legislature, that each and every word in a statute must be given *some* effect different from and not embraced within other words of the act. United States *v.* Gooding (12 Wheat., 460); Bend *v.* Hoyt (13 Pet., 263); Hardy *v.* Hoyt (13 Pet., 292); Early *v.* Doe (16 How., 610); Eyster *v.* Centennial Board of Finance (94 U. S., 500); Wilmot *v.* Mudge (103 U. S., 217); East Tenn., etc., R. Co. *v.* Interstate Commerce Commission (181 U. S., 1); Murphy *v.* Utter (186

U. S., 95) ; Market Co. v. Hoffman (101 U. S., 112) ; Stephens v. Cherokee Nation (174 U. S., 445) ; Adams v. Woods (2 Cranch., 336).

We are unavoidably confronted with the dilemma that these treaty provisions are certainly either executory or self-executing or executed by subsection 7 and must be so construed. We are confronted with the further fact that if any rule of construction is applied to this statute *which gives it present operation* that it will " affect " these treaties however they may be construed. There seems no escape from these results.

If executory and not executed by the subsection, its present operation " affects " and contravenes the treaty promises, vitalizes and makes them the foundation of claims of equal treatment upon the legislative department of the Government or reparation by the Executive.

If self-executing, upon the subsection being given operation, the subsection equally " affects " them as they would be as thus construed, a part of the municipal law of the land and, upon operation of the subsection, be contravened or repealed.

If executory, and we construe subsection 7 as executing the treaty articles, it " affects " the treaty articles, for, if the enactment so executes, it must necessarily " act upon " them. Moreover, by executing an executory treaty promise the enactment executing " enlarges " the treaty promise, or national obligation, theretofore enforcible or performed only by legislation and diplomacy, and not the courts, by enacting the treaty promise into municipal law as a Federal statute enforceable by the courts establishing, which it must do to so execute, as a municipal law, the measure of reparation for breach of the particular promise. An executing statute therefore " affects " an executory treaty by prescribing the penalty of its breach as to the particular subject matter, affording a new tribunal for its determination 'and, usually, the determined reparation.

In this connection it would seem an appropriate place in the consideration of these appeals to observe that after stating the case and reciting the various issues presented the majority opinion proceeds to announce and support with ample authorities several well-known and universally accepted rules of statutory construction; and then states: " The force and application of these rules will be kept in mind in the discussion." The following pages and the conclusion reached . attest this observance and under ordinary circumstances would seem indubitable. The difficulty, however, which arises seems to be that the Congress by this *proviso* has unequivocally and affirmatively denied the courts the right to invoke in the construction of this statute any of the well-known rules of construction which tend to a certain conclusion, which conclusion each and all of those rules invoked by the majority opinion tend and are held to establish. The plain un-

mistakable mandate of the proviso addressed the courts is that no rule of construction shall be adopted which will cause this statute to *affect* any existing treaties; nevertheless, the opinion of the majority seems to adopt those rules of construction which as applied give this statute such force and effect as acts upon and vitalizes these dormant promissory treaty provisions, laws in repose, and makes them the foundation not only of claims against this Government but, they hold, of such claims enforcible by decree of the courts.

The inquiry is prompted, What, if any, recognized rule of construction is applicable to this subsection which will give this provision effect, harmonize the manifest purposes of the Congress, and the language it has here enacted?

We recapitulate, to emphasize the congressional purpose, that this provision of law emanated from a conference between the House standing for the purview of the provision and the Senate opposing it upon the ground, chiefly, that it would contravene our treaty promises, and thereby, so long as those treaties existed, would bring upon us retaliation which would not only be injurious to our commerce but defeat the very purpose of the law. We know that the Senate had rejected the proposition to either legislatively terminate those treaties or fix a limited time for the President to annul them upon notice, thereby indicating the Senate's unwillingness to abrogate these treaty articles other than by mutual agreement. I am unable to read the amendments rejected by the Senate as resulting that it " had expressly refused to provide for the orderly abrogation of these treaties " as interpreted by the majority. The one provided immediate abrogation, the other directed such within the treaty time, one year. Their rejection seemed a declaration of the Senate against *abrupt* or limited abrogation, but not abrogation by agreement or consent. The Senate being constitutionally a part of the treaty-making power and the House not, naturally was more tenacious of its previous acts. Subsection 7 represents these combined views, to wit, that of the House, subvention for our merchant marine, and that of the Senate, that it should not become effective so long as it 'abrogated or in any manner impaired or affected any treaty with any foreign nation.'

It therefore seems incontrovertible that any rule of construction giving effect *in præsenti* to this subsection would be violative of the congressional purpose in that it would of necessity abrogate, impair, or in some manner affect the treaties. What rule of construction avoids that effect?

In passing it may be noted that the construction put upon this proviso by the opinion of the majority *extending* the purview to treaty vessels is in violation of the usual construction of provisos. " The general purpose of a proviso, as is well known, is to except the clause

covered by it from the general provisions of a statute, or from some provisions of it, or to *qualify the operation of the statute in some particular*." Georgia Banking Co. *v.* Smith (128 U. S., 174–181) ; Minis *v.* United States (15 Pet., 40 U. S., 423–425). The construction given does not qualify but extends the purview from American to all treaty vessels.

A familiar office of a proviso is to "so qualify the operation of the statute" as to suspend its operation until its terms are satisfied. Thus in Voorhees *v.* United States Bank (10 Pet., 35 U. S., 449–471) the Supreme Court states:

> The various acts required to be done, previous to sale, are prescribed by a proviso, which in deeds *and laws* is a limitation or exception to a grant made or authority conferred, the effect of which is to declare that the one shall not operate, nor the other be exercised, unless in the case provided.

In Austin *v.* United States (155 U. S., 417–431) this opinion was quoted with approval. The Supreme Court of New Jersey in Snyder *v.* Insurance Co. (59 N. J. L., 544–548) declared: "*Proviso*, when used, always implies a condition unless subsequent words change it to a covenant." The Supreme Court of New York, in Waffle *v.* Goble (53 Barbour, 517–522), epitomized the functions of a proviso as follows:

> A proviso in a statute always *implies a condition,* unless modified by subsequent words. The difference between an exception and a proviso in a statute is that the first exempts absolutely from the operation of the enactment, whereas the latter only *defeats the operation of the enactment conditionally.* (Bouv. Law Dict., tit. "Proviso," and cases there cited.)

A proviso is something engrafted on a preceding enactment by way of limitation or otherwise, and is held to operate as a repeal of the purview of the act where it is inconsistent with it, as expressing the last intention of the lawgiver. (Smith's Commentaries on Statute and Constitutional Law, 712.)

Bouvier's Law Dictionary, vol. 2, article Proviso, succinctly states:

> A proviso differs from an exception; 1. * * * An exception exempts, absolutely, from the operation of an engagement *or an enactment;* a proviso *defeats their operation, conditionally.*

An apt illustration of a congressional act upon condition which might or might not ever become effective is illustrated in Dunlap *v.* United States (173 U. S., 65) and cases therein cited.

So that if we construe this subsection as one upon the condition that it shall not become effective so long as it contravenes any of these treaties, which condition is prescribed by the proviso, the latter is satisfied and conditional *effect* is given the subsection. *Thus we neither declare the act merely a declaration of policy nor void nor give to the proviso the objectionable construction that it is repugnant to the purview as inhibited by Dollar Savings Bank v. United States*

*(19 Wall., 86 U. S., 227)*, *but declare it a substantive law upon condition to take effect when that condition is satisfied.*

Moreover, this construction does not deny but gives application and full force and effect to each and all of the rules of construction applicable to the subsection enumerated by the majority, to wit: 'It will not be held that the lawmaking body has done a vain thing, but that it intends that its acts and every part thereof are valid and capable of being carried into effect' (Lewis's Sutherland Statutory Construction, sec. 497); 'that the statute is so construed as to sustain rather than defeat it, to give it operation'—*in futuro*—and 'is not treated as meaningless'; Bird *v.* United States (187 U. S., 118); Bernier *v.* Bernier (147 U. S., 242); Platt *v.* Union Pacific Railroad Co. (99 U. S., 48); Market Co. *v.* Hoffman (101 U. S., 112); Louisville Water Co. *v.* Clark (143 U. S., 1); 'that it rules the excepted thing to be within the general words of the purview and that the proviso is not repugnant to the body of the section'; Minis *v.* United States (15 Pet., 40 U. S., 423); Greely *v.* Thompson (10 How., 51 U. S., 225–236); Dollar Savings Bank *v.* United States (19 Wall., 86 U. S., 227); Sonneborn Sons *v.* United States (1 Ct. Cust. Appls., 443; T. D. 31504); Interstate Commerce Commission *v.* Baird (194 U. S., 25–36); and 'permits the statute itself to furnish its own rule of interpretation.' (Lewis's Sutherland Statutory Construction, sec. 366.)

The construction reading this subsection as a statute upon condition prescribed by its proviso places it in the same class with all legislation upon the subject of discriminating and retaliatory duties from 1815 to date. *Almost if not every act of Congress during said period and now in force providing for the levy or withdrawal of discriminating duties was and is a statute upon condition, and this condition was usually, if not uniformly, effected or extinguished by diplomacy and treaty pourparlance.* That was true of the acts of 1815, 1824, and 1828. It is equally true of section 4228, Revised Statutes, embodying the features of the act of 1828, now in force, proclamation of the fulfillment of the condition precedent to its application to Cuba of which was made as late as July 3, 1902 (32 U. S. Stat., pt. 2, p. 2013).

That class of legislation has long since and continuously been upheld by the Supreme Court, so that it is no longer questioned that Congress can enact legislation to become effective or suspended or repealed upon certain contingencies either named in the act itself or in other acts or implied. Brown *v.* Barry (3 Dallas, 3 U. S., 365); Levey *v.* Stockslager (129 U. S., 470). So Congress may rest the vitality and force of an act upon a condition that may not be acted upon. Beaty *v.* Knowler (4 Pet., 29 U. S., 152). If there were necessity to justify or vindicate the wisdom of such legislation, that

has long since been done by the Supreme Court in Field *v.* Clark. The court said:

There are many things upon which wise and useful legislation must depend which can not be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation. (Field *v.* Clark, 143 U. S., 649–694; United States *v.* American Sugar Refining Co., 202 U. S., 563.)

Indeed, in this very act we find numerous instances of similar conditional legislation, and this construction fully harmonizes this subsection with the other provisions of the act. J, subsection 1, supra, is a conspicuous instance relating to retaliatory duties conditionally levied, and numerous instances occur in other parts of the act. Indeed, this class of legislation seems to have particularly actuated the framers of this more than any previous tariff act.

There would, therefore, seem to be no escape from the conclusion that this subvention was granted vessels of American registry to take effect only upon these reciprocal treaty promises being removed or satisfied.

It was peculiarly natural that since any possible contributing legislative cause to the decadent condition of our merchant marine was wrought by conditional legislation permitting and being followed by reciprocity treaties contributing thereto, that the repairment of that decadence should be approached by like conditional legislation looking to the elimination of those treaties, contemplating like pourparlance, and this reflex sheds no little light on the congressional intent in subsection 7.

But it is strenuously urged by counsel for the importers that this conclusion is negatived in that "the termination of a treaty on notice is the function of Congress, and Congress having in this particular instance, after full consideration and knowledge, not only deliberately refused to exercise its prerogatives, but having adopted a proviso indicating its purpose not to abrogate or impair existing treaties," etc., hence the treaty-making power was left powerless to abrogate *or negotiate* substitute treaty provisions. *It certainly can not be seriously contended that the failure of Congress to legislate, or any affirmative legislation by Congress, can nullify or arrest in any degree the functions and activities of the treaty-making power, including that of substitute treaties vested by the Constitution in the President and the Senate.* Indeed, that the notice of abrogation to terminate a treaty, while as said by Moore (International Law Digest, vol. 5, p. 322), is *usually* authorized by joint resolution of Congress, that has not always been the case, and when done unquestioned. Articles VIII and XII, inclusive, of the treaty of 1850 between the United States and Switzerland, being the most favored nation and reciprocal duty provisions thereof, were by notice pur-

suant thereto given March 23, 1899, terminated by the Executive of this country and no congressional action had. Malloy's Treaties (vol. 2, p. 1763).

The treaty of 1832 between the United States and Russia was terminated by notice pursuant thereto, given December 17, 1911, by the Executive of this country, and not until afterwards approved by the Congress by joint resolution (37 Stat., 627).

Aside from these considerations, all these suggested objections find ready answer in the provisions of the act itself, which strongly corroborate, if they do not demonstrate, the congressional purpose. Assuming that subsection 7 standing alone suggested and authorized no negotiations whereby these reciprocal treaties could be eliminated, in construing an act it is elementary that we must read all parts together to ascertain the congressional purpose, and by so doing we find such a provision in subsection 7 would have been surplusage, for Congress had already in subsection A, this section, fully authorized and empowered the President to negotiate trade agreements looking to further reciprocal expansion of trade and commerce. Why, then, here reiterate this grant of power?

So that, reading all the provisions of the act together, we find a consistent scheme of legislation. J, subsection 1, enacting a discriminating duty of 10 per cent to prevent discrimination against this country, long a provision of our statutes, and here reenacted, a statute upon condition, which condition was not named therein, but intended to be, and which has uniformly been removed by diplomatic parlance; subsection 7, granting a discount upon conditions not named therein, intended to be as customarily removed by diplomatic parlance, which by subsection 1 was authorized and its ratification expressly therein provided.

We may here pause to inquire why, if Congress did not understand that it had authorized and anticipated the negotiation of reciprocal commercial treaties affecting the public revenues, it enacted as a proviso as to all such treaties negotiated under Section IV, paragraph A, " that said trade agreements before becoming operative shall be submitted to the Congress of the United States for ratification or rejection "?

And so the Sixty-third Congress embarked upon the task, in so far as it could by legislation be accomplished, of restoring the American merchant marine to its former prestige by the natural method of returning thereto by the same course we departed therefrom, without violating any national treaty promise, but by keeping faith with all nations; without violent interruption of trade and commerce, but with a gradual adjustment; not in a hapless way, without thorough knowledge of all the secret as well as obvious causes of our difficulty, but in a studious way ascertaining and eliminating as we

proceed all alleged discriminations in violation of our present national conventions and other contributing causes and conditions.

The next inquiry in order following this conclusion is, if the operation of the provision is thus suspended, is it conditional upon the elimination of *all* the treaties or does it become effective as to each country as the particular treaty permits? If the latter, it is of course presently effective as to all nontreaty nations; that is, nations without the particular treaty article. The answer to this inquiry seems to be made by the language of the proviso itself. The effect thereof being to postpone application of the paragraph until the conditions written in the proviso are satisfied, it follows that it must be suspended so long as it ' shall abrogate or in any manner impair or affect *the provisions* of *any* treaty concluded between the United States and *any* foreign nation.' That is, it is not effective *in præsenti* as to any nation or its vessels. The statute construes itself, and " The courts can afford no redress." Whether the complaining nation has just cause of complaint or *our country was justified in its legislation, are not matters for judicial cognizance.* Whitney *v.* Robertson (124 U. S., 190–194).

But, it is said by the majority of this construction, that " a construction which leads to that result manifestly is at war with the rule that a proviso shall not be held to defeat the purview of a statute," etc. If to *suspend* means *defeat*, that argument is applicable. If suspend does not mean defeat, the argument has no place here. The approved language of the Supreme Court, Field *v.* Clark, seems more in point:

Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. Field *v.* Clark (143 U. S., 649, 694).

It is further urged with much assurance that if this construction is adopted as to subsection 7 the like construction must be put upon the similar language of subsection B, section 4, in consequence whereof, as that subsection relates to the whole tariff act, its operation would be suspended until the Cuban treaty is eliminated. The contention overlooks controlling differences between the respective treaties and subsections. The Cuban treaty in its full import was at the time of this enactment not a promissory law in repose, but an executed treaty, the executing statute being in full operation and effect, and it is so continued *ex vi termini* under this act regardless of subsection 7. There is therefore nothing in subsection 7 which does abrogate, impair, or *in any manner affect* the Cuban treaty by acting upon or calling it into effect. This would seem conclusive, but instructive lessons are here afforded.

The Cuban treaty signed December 11, 1902 (33 Stat., 2136–2142), was by act of Congress ratified and executed December 17, 1903 (33 Stat., 3, ch. 1). That act, as previously stated, enacted as a Federal municipal statute all the provisions of the Cuban treaty fixing in definite figures and terms the automatically preferential rates between Cuba and the United States. It thus became a statute cognizable by our courts. The promissory treaty articles were thus executed and recourse afforded to the courts by a substitute municipal law for enforcement.

The schedule of the tariff act of 1909 would have repealed this act and relegated Cuba to reclamation by retaliation or parlance but for section 3 of that act, precisely in the language of J, subsection 7. So the schedules of the act of 1913 would have repealed, with like effect upon the Cuban treaty, the act of December 17, 1903, executing the Cuban treaty. But Congress incorporated in the act of 1913, subsection B, former section 3 of the act of 1909.

Subsection B, however, differs crucially from subsection 7 in that it not only provides it shall not be construed "to abrogate or in any manner impair or affect the provisions" of the Cuban treaty, but in addition extends those inhibitions to "*the provisions of the act of Congress heretofore passed for the execution*" of the Cuban treaty.

The effect of this *additional* provision was to retain in force and, in effect, reenact the act of December 17, 1903, as a part of the tariff act of 1909, and again as a part of the present act of 1913. In this legislative status, when the municipal law of the United States affecting Cuba is laid before the courts, there is included as a part of the tariff act of 1913 the act of December 17, 1903. The promissory treaty articles are not important or a part of that law or relevant save as constructive indices. Without reference to any treaty article we read, as before, the duty on linen cuffs (products and imported from Cuba) under paragraph 277 is 30 per cent. We read not from the treaties, but from the statutes—act of December 17, 1903—that a 20 per cent reduction *is allowed by act of Congress*, expressly retained in force by subsection B as a part of the tariff act of 1913. Here we find an executed treaty. Here we find a case cognizable and enforcible by the courts, *because* the rights are fixed not by a treaty promise but by Federal municipal law, to which and which alone the courts can look for all the law in the case *necessary to sustain the action and admeasure judgment*.

The issue is in the case, What effect does subsection J have upon the Cuban treaty? Apparently none. Subsection B carefully recited that nothing in *this act* shall affect the Cuban treaty *or* the provisions of the act of Congress heretofore possessed for the execution of the same. Subsection 7 is "in this act," and by subsection B

it is provided that nothing " in this act " shall " affect " the provisions of the act of 1903, which automatically fixes the relative rates of duty to be charged upon Cuban importations under all American tariff acts, present and future.    Subsection B expressly excludes subsection 7 from any effect upon the Cuban treaty and the act of 1913 executing that treaty.

The necessity for subsection B in the act of 1913 and its parallel predecessor, section 3, in the act of 1909, are convincing that the Congress believed what seems obvious, that the enactment of the dutiable schedules of those acts without such a saving section would repeal the act of 1903 and violate the Cuban treaty promise.

In that situation, if it were sufficient to execute that treaty promise and restore it to the previously executed status enforcible in the court enjoyed under the act of 1903, to provide only that nothing therein " shall be construed to abrogate or in any measure impair or affect the treaties," why did Congress, in section 3, act of 1909, and subsection B, act of 1913, *after using that language*, proceed further and expressly save the act of 1903, executing the Cuban treaty? And if that language is sufficient to execute all these treaty articles, why did Congress go further in both these tariff acts of 1909 and 1913 as to the Cuban treaty to indulge the surplusage legislation of preserving the executing act of 1903?

For these reasons I am constrained to the opinion that Congress did not intend subsection 7 to be presently effective; and, that if so, the treaty provisions herein invoked are executory and neither self-executing nor executed by said subsection.

Finally, courts in construing an act must always seek out the intent of Congress and give effect thereto.    The very words of this act and every particle of the history of this enactment demonstrate the congressional purpose to *discriminate* in favor of *American* ships.

While it is true, as shown by the majority opinion, that owing to the great number of uncertain and indeterminable factors, it is impossible to accurately estimate the relative amount of tonnage carried in American as compared with foreign treaty vessels that would receive the benefits of this law, as construed by the majority opinion, there is sufficient of certain factors to disclose that at least twelve times more benefits would  accrue to foreign than to American ships, and that really all the great maritime nations of the world would share therein equally with our merchant marine.    Where, then, under this interpretation, is the advantage or benefit or *favor* to American vessels?    *How can it be said we discriminate in favor of American shipping when we give the same favor to all its important and effective competitors?*

If we consult current history and the report of the Ways and Means Committee herein, the present tariff act was constructed upon narrow lines of revenue without more incidental protection than deemed necessary to equalize the difference in cost of production and delivery. On the figures of the majority opinion this ruling reduces the duties 5 per cent upon at least more than one-half of our dutiable imports. Did Congress intend after all its labored adjustment of rates, in accordance with the stated principles, by this single paragraph to menace, if not destroy, the effect of all preceding carefully adjusted schedules?

It appears from the majority opinion that there are at least 5,500 treaty-nation vessels in the American foreign trade. It is certain that there are not over 50 American vessels. Did Congress, in order to benefit these 50 vessels and such as might in the course of years— necessarily few under this interpretation—register under our flag immediately give an equal bounty to 5,500 other vessels? If so, where was the "favor" to "our ships"?

The fact that during the enactment of this provision Congress changed its terms from American "built" vessels to vessels of American "registry" showed a desire to induce foreign ships to take advantage of the American registry. Is that intention subserved by extending this subsection alike to the foreign vessels of all the great shipbuilding nations of the world?

Placing such a construction upon this act not only does violence to the rule of construction prescribed in the proviso but to numerous well-settled, long-established rules of interpretation.

Thus in Hill v. American Surety Co. (200 U. S., 197, 203) the Supreme Court said:

Statutes are not to be so literally construed as to defeat the purpose of the legislature. "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter." (United States v. Freeman, 3 How., 556.) "The spirit as well as the letter of a statute must be respected; and where the whole context of a law demonstrates a particular intent in the legislature to effect a certain object, some degree of implication may be called in to aid that intent." Chief Justice Marshall in Durousseau v. United States (6 Cranch, 307); United States v. St. Anthony Railroad Co. (192 U. S., 524).

In United States v. Kirby (7 Wall., 74 U. S., 482, 486) an equally applicable rule was exercised:

All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. Jacobson v. Massachusetts (197 U. S., 11, 39); Treat v. White (181 U. S., 264, 267).

And, in Lau Ow Bew v. United States (144 U. S., 47, 59), that court said:

Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid unjust or an absurd conclusion. Church of the Holy Trinity v. United States (92 U. S., 259) ; United States v. Kirby (7 Wall., 482) ; Oates v. National Bank (100 U. S. 239).

The additional intent being manifested in the provision, however, that this purpose of Congress should not be put into force and effect so long as our treaty obligations stand in the way, I am of the opinion that the statute should be so construed as " will effectuate the legislative intention " when and as soon as possible.

If the gist of these views may be accented in conclusion, it is that the statute in question is an existing law of the land effective *in futuro;* that the treaty articles in question are constitutional and even *ratified* promises addressed to and to be regarded, disregarded, performed, or parleyed by the political branches of the Government and not enforced as complete municipal laws of the land.

For these reasons, it would seem that the protests of the importers herein are without judicial cognizance and should be dismissed.